# Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

ANDREA TANTAROS

           Plaintiff,

      v.

FOX NEWS NETWORK, LLC, ROGER
AILES, WILLIAM SHINE, IRENA
BRIGANTI, PETER A. SNYDER,
DISRUPTOR, INC., and JOHN DOES 1-50.

          Defendants.

------------------------------------------------------x

Case No. 17-cv-02958 (JGK)

ORAL ARGUMENT REQUESTED

## PETER A. SNYDER AND DISRUPTOR, INC.'S NOTICE OF MOTION
## SEEKING SANCTIONS PURSUANT TO RULE 11

PLEASE TAKE NOTICE that, upon all papers served and proceedings had herein,
including the letter from Randy Mastro, Counsel for Peter A. Snyder and Disruptor, Inc., ("Moving
Defendants") dated April 28, 2017, exhibits thereto, the instant Notice of Motion, and such other
and further papers and proceedings as may be filed or had, Moving Defendants will move this
Court at a time and date to be determined by this Court, before the Honorable John G. Koeltl,
United States District Judge, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl
Street, Courtroom 12B, New York, NY 10007, for an order imposing sanctions against Plaintiff
Andrea Tantaros and her counsel, Judd Burstein, pursuant to Rule 11(c) of the Federal Rules of
Civil Procedure, for the filing of Plaintiff's Complaint (Dkt. 1).  Specifically, Moving Defendants
will seek an order awarding sanctions, dismissing the Complaint with prejudice, awarding
attorneys' fees and costs incurred by Moving Defendants as a result of violations of Rule 11, and
granting such other and further relief as the Court deems just and proper.

Moving Defendants bring this motion on the grounds that Plaintiff and her counsel violated Rule 11 of the Federal Rules of Civil Procedure by willfully presenting to the Court a Complaint that **(a)** contains fabricated and self-contradictory allegations concerning Moving Defendants based on pure speculation and lacking any evidentiary support in violation of Fed. R. Civ. P. 11(b)(3); **(b)** mischaracterizes pre-litigation communications between Plaintiff's counsel and Moving Defendants' counsel in a false and nonsensical manner in further violation of Fed. R. Civ. P. 11(b)(3); **(c)** presents legal claims that are untenable as a matter of law as to Moving Defendants because such claims are time-barred and have no chance of success in violation of Fed. R. Civ. P. 11(b)(2); **(d)** was filed for the improper purpose of publicly smearing all Defendants (including Moving Defendants) in violation of Fed. R. Civ. P. 11(b)(1); **(e)** was filed for the improper purpose of avoiding confidential arbitration in violation of the broad arbitration clause in Plaintiff's employment agreement with Fox News and the New York Supreme Court's order compelling confidential arbitration of her harassment and retaliation claims in *Tantaros v. Fox News Network, LLC*, No. 157054/2016, ECF No. 74 (Sup. Ct. N.Y. Cty. Mar. 9, 2017), *see* Fed. R. Civ. P. 11(b)(1); and **(f)** is a blatant strike suit filed for the improper purpose of extorting a settlement from Moving Defendants in violation of Fed. R. Civ. P. 11(b)(1).

Dated: New York, New York
        April 28, 2017

GIBSON, DUNN & CRUTCHER LLP

By: _____
        Randy M. Mastro
        Mylan L. Denerstein
        200 Park Avenue
        New York, New York 10166-0193
        Telephone: (212) 351-4000
        Facsimile: (212) 351-4035

*Attorneys for Moving Defendants*

GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: +1 212.351.3825
Fax: +1 212.351.5219
RMastro@gibsondunn.com

April 28, 2017

<u>VIA EMAIL AND HAND DELIVERY</u>

Judd Burstein, Esq.
5 Columbus Circle
1790 Broadway
New York, NY 10019

Re:   Defendants Peter Snyder and Disruptor, Inc.'s Notice of Motion Seeking
       Sanctions Pursuant to Federal Rule of Civil Procedure 11 ("Rule 11") in
       *Tantaros v. Fox News Network, LLC, et al.*, No. 17-cv-02958 (S.D.N.Y.)

Dear Counsel:

As you are aware, we are counsel for Peter Snyder and the company he founded, Disruptor,
Inc.  I write to provide you with the enclosed Notice of Motion Seeking Sanctions Pursuant
to Rule 11 (the "Notice of Motion"), and hereby demand that you withdraw your offending
Complaint against our clients, pursuant to Rule 11's safe harbor provisions.[1]  Indeed, I
warned you before you filed this spurious Complaint that you and your client are way off
base, that the allegations you described to me and intended to make against our clients were
false, time-barred, and subject to arbitration in any event, and that we would hold you and
your client accountable if you proceeded anyway.  Now, I have read the Complaint you filed
against our clients; it truly is an outrage, and you could not have filed it in good faith.
Hence, if you do not withdraw all claims and allegations against our clients, we intend to file
Rule 11 sanctions against you and your client.

As you know, Rule 11 of the Federal Rules of Civil Procedure imposes a duty to present
factual allegations that "have evidentiary support," Fed. R. Civ. P. 11(b)(3), legal claims that
are "warranted by existing law," Fed. R. Civ. P. 11(b)(2), and prohibits filings made "for any
improper purpose," Fed. R. Civ. P. 11(b)(1).  The Complaint filed in this case, however,

---

[1]   In accordance with Federal Rule of Civil Procedure 11(c) and the Second Circuit's decision in *Star Mark
      Management Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170 (2d Cir. 2012), this
      Letter and the enclosed Notice of Motion, together with the authorities cited in each, "describe the specific
      conduct that allegedly violates Rule 11(b)," and qualify as a "motion for sanctions" against you and your
      client, Andrea Tantaros, as the parties responsible for the filing of the baseless, frivolous, and vexatious
      allegations in the Complaint (Dkt. 1).

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

GIBSON DUNN

April 28, 2017
Page 2

demonstrates that you and your client wholeheartedly abandoned any attempt to comply with your Rule 11 duties:

a) The Complaint's allegations against our clients are not merely lacking "evidentiary support," but are completely fabricated and based on flimsy conjecture;

b) The Complaint mischaracterizes the pre-litigation communications between you and me in a false and nonsensical manner;

c) The Comlaint's legal claims against our clients are untenable as a matter of law because they are implausible, based on self-contradictory allegations, and time-barred;

d) The Complaint was filed for the improper purpose of publicly smearing all Defendants;

e) The Complaint was filed in clear violation of both the extremely broad confidential arbitration clause in Ms. Tantaros' employment agreement with Fox News and the New York Supreme Court's order compelling confidential arbitration of her harassment and retaliation claims against certain Defendants in this action; and

f) The Complaint is a blatant strike suit intended to shake down the Defendants for money.

For all these reasons, sanctions against you and your client will be warranted if you refuse to withdraw your Complaint against our clients. Whatever your issues with the other Defendants here, you should have left our clients out of it, and your failure to do so will now subject you and your client to sanctions if you fail to satisfactorily respond to this notice letter.

### Sanctions Are Warranted Under Rule 11(b)(3) Because the Complaint Is Self-Contradictory and Based Entirely on Speculation and Conjecture

You have failed to perform your duty to confirm that, after "an inquiry reasonable under the circumstances[,] . . . the factual contentions [in the Complaint] have evidentiary support." Fed. R. Civ. P. 11(b)(3). A complaint's assertions based completely on "speculation and conjecture," unsupported by "tangible evidence" and "grossly mischaracteriz[ing]" a defendant's actions will result in the imposition of sanctions. *Binghamton Masonic Temple, Inc. v. Bares*, 168 F.R.D. 121, 127–29 (N.D.N.Y. 1996) (inferring improper purpose from complete lack of factual and legal basis for bringing a claim; holding plaintiffs' claims had

GIBSON DUNN

April 28, 2017
Page 3

no chance of success and were frivolous; and awarding monetary sanctions for attorney fees and nonmonetary sanction of requiring attorneys to seek leave from court before filing papers). Furthermore, "[a] baseless factual contention poses a greater threat to justice than a baseless legal contention," and thus warrants severe sanctions. *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 124, 128, 132 (S.D.N.Y. 2007) ("factual contention" that was "objectively without rational basis" and "utterly lacking in support" warranted imposition of sanctions for $750,000); *see also Shetiwy v. Midland Credit Mgmt.*, 2014 WL 3739512, at *3 (S.D.N.Y. July 29, 2014) (finding that Rule 11 was violated where attorneys "fail[ed] to ensure a factual basis for each of their allegations").

Here, the Complaint's lone attempt to connect our clients to Ms. Tantaros' harassment is based upon the type of truly fantastical "speculation," "conjecture," and "mischaracterization" that is sanction-worthy. *Binghamton Masonic*, 168 F.R.D. at 127. The Complaint's sole basis for our clients' alleged involvement with the harassment scheme is that on April 18, 2017, at 11:13 pm EST, "just one hour and 17 minutes after Ms. Tantaros' counsel informed Snyder's counsel that Ms. Tantaros was going to be suing Snyder in the next day or two, Nomiki Konst sent out a defamatory Tweet in which she falsely claimed that Ms. Tantaros had physically assaulted and threatened her." ¶ 80(f). The logical leap required here—that Mr. Snyder immediately took this information to Fox News and coordinated retribution—is not only astounding (and unfounded), but belied by the actual record, which the Complaint mischaracterizes.[2]

On Monday, April 17, we spoke on the phone, and I asked for additional time to consult with my client because I had just been retained three days ago. On that call, I advised you that neither Mr. Snyder nor any of his companies had performed any social media work for Fox News since 2012, and that there could not have been related conduct on our clients' part within the applicable statute of limitations period. You responded that you needed to consult with your client. Later that same day, at 2:02 pm, you emailed me that your client would not agree to any additional time and that you would be sending a demand letter. Ex. A. That same day, April 17, 2017, at 3:13 pm, you sent a demand letter for $15 million to be paid by "no later than 5:00 pm on April 18, 2017." Ex. B. You knew that the demand was not only preposterous, but the timing was ludicrous, given your statement: "I know I am asking for a big number. . . . I wish I had the freedom to be more generous with timing, but it is out of my hands." *Id.* It was therefore clear to everyone by 5:00 pm on April 18, 2017, that litigation would commence—a sentiment that I further clarified in my email response to you

---

[2] Notably, the Complaint does not allege that Disruptor, Inc. played any role in this alleged event. Its inclusion in this action is therefore meritless because, as discussed herein, the allegations against it are implausible and time-barred.

GIBSON DUNN

April 28, 2017
Page 4

at 7:45 pm.  Ex. C.  In fact, you had written directly to Mr. Snyder on April 10 and
threatened litigation if he did not accede to your shakedown, so it was clear you were
intending to sue him as early as April 10.  Ex. D.[3]  It is entirely speculative that Mr. Snyder
as a result of this had any role whatsoever in a Tweet by third-party Nomiki Konst at 11:13
pm on April 18:  There is absolutely no temporal (or causal) connection between our
correspondence and the Tweet sent that night by a person unaffiliated to Mr. Snyder or
Disruptor, Inc.  Even more bizarre, the Tweet by Ms. Konst describes Ms. Tantaros' alleged
assault of her.  It has nothing to do with Mr. Snyder whatsoever.  And neither does the
purported retweeting by another party, Oliver Darcy, unconnected to our clients.

As I explained to you in our correspondence, "Pete Snyder long ago sold his social media
company (New Media Strategies) and has done no social media-related work for Fox in
many years, let alone any 'ongoing' activity relating to Andrea Tantaros."  Ex. C.  You
directly sent my client an email on April 10, 2017, accusing him of operating an "ongoing
abusive, disturbing, exploitative and frankly, horrific social-media influence campaign
targeting Andrea Tantaros on behalf of Fox News under the direction of Bill Shine and
Roger Ailes," Ex. D, yet the only supposed "evidentiary support" you offer for this wild
allegation is the timing of a third-party Tweet from eight days *after* your initial accusations,
Rule 11(b)(3).  This is precisely the type of "factual contention" that is "objectively without
rational basis" and "utterly lacking in support," warranting sanctions.  *In re Sept. 11th Liab.*,
243 F.R.D. at 128.

Even more, the Complaint's futile attempt to tie Mr. Snyder and Disruptor, Inc. to the
harassment of Ms. Tantaros is inherently ***self-contradictory***.  "Self-contradictory
assertions . . . clearly lack reasonable evidentiary support, in violation of Rule 11(b)(3)."
*Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *13–14 (S.D.N.Y. Sept.
24, 2008) (granting motion to dismiss complaint including intentional infliction of emotional
distress claim, finding inconsistencies between versions of the complaint and intent to harass
and possibly extort a settlement), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

Here, the Complaint and the contemporaneous emails attached to it depict Mr. Snyder trying
to *help* Ms. Tantaros, not hurt her.  The Complaint states that "Ms. Tantaros and the Snyders
were friendly enough that Ms. Tantaros stayed at Snyder's Nantucket home on a number of
occasions."  ¶ 74.  It includes a March 2014 email in which Mr. Snyder reaches out to Ms.
Tantaros after she had asked Mr. Snyder for advice in forming a strategy and then attending

---

[3]   After sending this incredible email directly to Mr. Snyder on April 10, you then republished it almost
verbatim in the complaint you filed on April 19 in the action captioned *Tantaros v. Konst*, No. 153637-
2017 (Sup Ct. N.Y. Cty.).  Your threat to publicize such salacious smears, even though false, coupled with
your demand for $15 million on such a short deadline, leaves no doubt the intention here was to coerce Mr.
Snyder into a settlement to avoid adverse publicity, which is tantamount to extortion.

GIBSON DUNN

April 28, 2017
Page 5

internal Fox News meetings by her side, as Ms. Tantaros sought to increase her role and
influence at Fox News by trying to convince Roger Ailes and Fox News executive John
Moody to give her a key role in driving a new digital strategy for the channel.  Compl. Ex.
JJ.  As Ms. Tantaros' friend, Mr. Snyder was happy to lend a hand, even though he was paid
by neither Ms. Tantaros nor Fox News for digital consulting.  *Id.*  Indeed, contemporaneous
emails sent and received by your client in late 2013 and early 2014—all presumably
available to her and you—corroborate that she sought, and Mr. Snyder provided, advice as a
friend to her in furtherance of her attempts to advance her career at Fox News through a
digital initiative.  *See* Exs. E, F.  The Complaint also states that Mr. Snyder "once tried to
hire [Ms. Tantaros] to run [New Media Strategies'] public affairs department."  ¶ 74.
Considering that the Complaint expressly admits that Mr. Snyder's purported 2013
consulting work for Fox News did *not* include using "digital tools to attack Fox News
employees, let alone women who had claimed to have been sexually harassed by Ailes or
O'Reilly," ¶ 75, the natural (and correct) implication would be that Mr. Snyder had nothing
to do with any alleged harassment of Ms. Tantaros.  Indeed, the facts will show that Mr.
Snyder did not have *any* paid consulting relationship whatsoever with Fox News after 2012.

**Sanctions Are Warranted Under Rule 11(b)(2) Because the Complaint Is Time-Barred
and Has No Chance of Success Against Our Clients**

As I explained to you last week, Plaintiff's claims are time-barred.  The statute of limitations
is two years for Plaintiff's 18 U.S.C. § 2511 claim, *see* 18 U.S.C. § 2520(e), and one year for
her intentional infliction of emotional distress claim.  *See Ahmed v. Purcell*, 2016 WL
1064610, at *4 (S.D.N.Y. Mar. 14, 2016) ("It is well established under New York law that a
claim of intentional infliction of emotional distress has a one-year statute of limitations. . . .
Thus, when a court assesses such a claim, it can only consider the defendant's behavior in the
year before the claim was filed." (internal citations and quotations omitted)).  Here, our
clients have not performed any consulting work for Fox News *since 2012*—rendering
Plaintiff's claims untimely by several *years*.  Indeed, courts frequently impose Rule 11
sanctions where plaintiffs advance time-barred claims.  *See, e.g.*, *Norris v. Grosvenor Mktg.
Ltd.*, 803 F.2d 1281, 1288 (2d Cir. 1986) (Rule 11 sanctions warranted where plaintiff's
claims were clearly time-barred); *Voiceone Commc'ns, LLC v. Google Inc.*, 2014 WL
10936546, at *13 (S.D.N.Y. Mar. 31, 2014) (granting motion for sanctions where plaintiffs
filed multiple time-barred claims).

Further, Ms. Tantaros' claims are not "warranted by existing law" because it is "'patently
clear that [Plaintiff's] claim[s] ha[ve] absolutely no chance of success.'"  *Binghamton
Masonic*, 168 F.R.D. at 126 (quoting *Sussman v. Bank of Isr.*, 56 F.3d 450, 457 (2d Cir.
1995)).  Because, as discussed above, the Complaint does not plausibly allege any non-
conclusory facts showing that our clients participated in the scheme to harass Ms. Tantaros,

GIBSON DUNN

April 28, 2017
Page 6

its claims fail as a matter of law under clear Supreme Court precedent—the *Iqbal* and *Twombly* pleading standards. *See, e.g.*, *PetEdge, Inc. v. Garg*, 2017 WL 564088, at *12 (S.D.N.Y. Feb. 10, 2017) (plaintiff failed to meet the "plausibility" pleading standard in a case against a consulting company's CEO when it alleged "conclusory allegations regarding [defendant's] direct involvement in the alleged scheme" without offering any concrete evidence); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

### Sanctions Are Warranted Under Rule 11(b)(1) Because the Complaint Is a Transparent Attempt to Avoid Court-Ordered Confidential Arbitration and Is an Impermissible Strike Suit

Plaintiff's claims were also brought for the "improper purpose[s]" of harassing our clients into a quick settlement or forcing them to undertake vexatious litigation that is properly subject to confidential arbitration. Fed. R. Civ. P. 11(b)(1).[4]  Courts typically apply sanctions under Rule 11(b)(1) where, as here, a plaintiff attempts to re-litigate an issue in a new venue or to avoid arbitration. *See, e.g.*, *Manwani v. Brunelle,* 99 F.3d 400 (2d Cir. 1995) (discussing imposition of Rule 11 sanctions against plaintiff who attempted to relitigate in E.D.N.Y. a New York State court order compelling arbitration); *Ginther v. Provident Life & Cas. Ins. Co.*, 350 F. App'x 494, 496 (2d Cir. 2009) (affirming sanctions against plaintiff who, among other things, "imported frivolous . . . allegations from his state case into . . . federal litigation," which harassed defendant, "delay[ed] the conclusion of th[e] case, and needlessly increase[d] the cost of litigation").[5]  Indeed, federal statute provides that "any person . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

---

[4]   Rule 11(b)(1) states: "By presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1).

[5]   *See also Amorosa v. Ernst & Young LLP*, 2010 WL 245553, at *5 (S.D.N.Y. Jan. 20, 2010) (imposing sanctions where "plaintiff . . . filed a repetitive suit"); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 666 (S.D.N.Y. 1997) (imposing sanctions where "plaintiff's counsel had no reasonable basis for filing the instant action given [plaintiff's] clear obligation to arbitrate her claims against the defendants" because a prior court order "explicitly held that 'the arbitration clause at issue governs *any* claims related to [plaintiff's] employment with [defendant]'" (emphasis in original) (internal citations omitted)), *aff'd*, 173 F.3d 844 (2d Cir. 1999).

GIBSON DUNN

April 28, 2017
Page 7


As you are well aware, Justice Cohen of the New York Supreme Court ordered that Ms. Tantaros' harassment and retaliation claims against *all* parties, including non-signatories to her employment agreement and individual defendants, belong in arbitration. *See* So-Ordered Transcript at 36:14–38:19, *Tantaros v. Fox News Network, LLC*, No. 157054/2016, ECF No. 74 (Sup. Ct. N.Y. Cty. Mar. 9, 2017). As already determined in the related state court case, the claims in the present case must also be arbitrated because they directly relate to Ms. Tantaros' employment with Fox News, and therefore fall under the broad arbitration clause in her employment agreement:

> Any controversy, claim or dispute arising out of or relating to this Agreement or your employment shall be brought before a mutually selected three-member arbitration panel and held in New York City in accordance with the rules of the American Arbitration Association then in effect. . . . Such arbitration, all filings, evidence and testimony connected with the arbitration, and all relevant allegations and events leading up to the arbitration, shall be held in strict confidence. . . . . Breach of confidentiality by any party shall be considered to be a material breach of this Agreement.

Ex. G.[6] Indeed, with respect to the individual defendants, Justice Cohen held:

> All of the individual defendants, ***though they are not signatories to the arbitration agreement, can invoke the arbitration clause and compel arbitration***. This would apply even if the claims against them were severed from the claims against Fox. ***The misconduct alleged by plaintiff relates to these individual's behavior as*** officers, directors and employees or ***agents of Fox***, and they necessarily relate to their alleged conduct as agents of Fox News. Further, a careful review of the claims against the individual defendants shows that ***these claims are factually intertwined with the agreement and the claims against Fox News. The claims against the individual defendants involve the very same issues and circumstances***. This principle applies equally to the employment claims and the tortious interference claims at issue in this case. Allowing such claims to proceed in court would be contrary to established public policy strongly favoring arbitration of such disputes.

---

[6] Ex. G represents the portion of Ms. Tantaros' Employment Agreement that is on the public record in *Tantaros v. Fox News Network, LLC*, No. 157054/2016, ECF No. 74 (Sup. Ct. N.Y. Cty. Mar. 9, 2017). Neither we nor our clients have access to a complete version; neither did Justice Cohen when he compelled arbitration in the state action.

GIBSON DUNN

April 28, 2017
Page 8

Ex. H at 37:6–23 (emphasis added).[7]  Thus, the Complaint is nothing but an attempted end-run around this ruling, as it is based on the same underlying theory: "sexual harassment" and "retaliation."  *See* Compl. ¶¶ 1, 2, 4, 5, 8–10, 17, 23, 24, 26–28, 41, 43, 46, 75.[8]

Further, Justice Cohen held that Ms. Tantaros "involved the news media in this dispute in violation of the confidentiality provisions of the parties' agreement" and noted your "individual involvement in breaching that confidentiality [provision]."  Ex. H at 22:4–8, 38:4–6.  Your continued publicity of a "confidential arbitration," Compl. ¶ 10, in derogation of Justice Cohen's order also calls for sanctions.  *See Bernard v. Galen Grp., Inc.*, 901 F. Supp. 778, 782–84 (S.D.N.Y. 1995) (sanctioning attorney for violating "confidentiality provisions" in "alternative dispute resolution context"); *see also Spoth v. M/Y SANDI BEACHES*, 2010 WL 2710525, at *6 (W.D.N.Y. July 7, 2010) (awarding plaintiff § 1927 sanctions where defendant violated an ADR plan by disclosing confidential communications made during the mediation).

Finally, sanctions are warranted here because the Complaint is nothing more than an impermissible strike suit.  Judge Chin previously criticized you for "'Rambo lawyering'" when you "employed inappropriate tactics in an effort to intimidate and harass [your adversary] into resolving th[e] matter on terms that [your client] and [you yourself] found acceptable," including by "fil[ing] suit just two days" after sending a letter purportedly "in one last effort to avoid litigation."  *Revson v. Cinque & Cinque, P.C.*, 49 F. Supp. 2d 686, 686–87 (S.D.N.Y. 1999), *judgment rev'd in part, vacated in part sub nom. Revson v. Cinque*

---

[7]   Our clients are thus entitled to arbitration pursuant to Ms. Tantaros' employment agreement with Fox News because the Notice of Litigation and Complaint make clear that our clients' alleged actions were undertaken as agents of Fox News.  *See* Ex. D ("social-media influence campaign targeting Andrea Tantaros on behalf of Fox News under the direction of Bill Shine and Roger Ailes"); *id.* ("salacious fake social media campaigns against various 'enemies,' including Ms. Tantaros, identified to you by Bill Shine at the direction of Roger Ailes"); *id.* ("fake websites and internet trolling to accomplish Fox News' goals"); Compl. ¶ 72 ("Defendant Snyder played a crucial role in Fox News's practice of using all available means to destroy whomever Ailes, and now Shine, considered to be an enemy"); *see also, e.g., McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, 2015 WL 144190, at *7 (S.D.N.Y. Jan. 12, 2015) ("[T]he corporate agent may use the arbitration provision as a sword to compel arbitration, which is to say, a shield against litigation before a court.").

[8]   The Complaint includes two different versions of ¶¶ 38–44: first in Section A.II.a.i and then again spanning Sections A.II.a.ii and A.II.a.iii.  This citation refers to the second versions of ¶¶ 41 and 43 in Section A.II.a.iii.

GIBSON DUNN

April 28, 2017
Page 9


*& Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000).  Here, you gave our clients even less time to come to a decision:  barely 24 hours.  Such transparent gamesmanship and harassment in itself warrants sanctions.  *See Smith v. Educ. People, Inc.*, 233 F.R.D. 137, 138, 143 (S.D.N.Y. 2005) (granting Rule 11 sanction where plaintiffs' conduct revealed "objective vexatious and harassing abuse of the judicial process," and their complaint "lack[ed] the necessary evidentiary support, as a reasonable inquiry *ex ante* would have revealed"), *aff'd sub nom. Smith v. Educ. People, Inc.*, 2008 WL 749564 (2d Cir. Mar. 20, 2008) (summary order).

\* \* \*

For all the foregoing reasons, it is incumbent upon you and your client to take immediate action to rectify the sanctionable failings set forth in the accompanying Defendants' Notice of Motion.[9]  I hereby demand that you withdraw all claims and allegations in the offending Complaint against our clients, Peter Snyder, and Disruptor, Inc., pursuant to Rule 11's safe harbor provisions.

Sincerely,

Randy M. Mastro

---

[9]  Sending this letter does not constitute acceptance of service, and our clients reserve all of their rights, including to challenge personal jurisdiction and venue.

# Exhibit A



**From:** Judd Burstein <JBurstein@BURLAW.COM>
**Sent:** Monday, April 17, 2017 2:02 PM
**To:** Mastro, Randy M.
**Subject:** RE: Your April 10 Litigation Notice

Randy:

I am sorry, but my client is immoveable.  I have, however, been authorized to make a settlement proposal, which I will be forwarding to you shortly.

Judd Burstein

Judd Burstein, P.C.

5 Columbus Circle

New York, New York 10019

(212) 974-2400

(212) 974-2944 (Fax)

(917) 687-2981 (Cell)

**NOTE:  THIS EMAIL IS BEING SENT FROM MY NEW YORK OFFICE.  PLEASE FIRST CALL THE OFFICE BEFORE CALLING MY CELL IF YOU NEED TO RESPOND BY TELEPHONE.**

**From:** Mastro, Randy M. [mailto:RMastro@gibsondunn.com]
**Sent:** Friday, April 14, 2017 4:47 PM
**To:** Judd Burstein <JBurstein@BURLAW.COM>
**Subject:** Your April 10 Litigation Notice

Dear Judd,

We meet again. I have just been retained by Pete Snyder, with whom I understand you have been communicating. I further understand that you have threatened to sue him imminently on behalf of your client, Andrea Tantaros. I am new to this matter, need to get up to speed, am heading out for the holiday weekend, but will be back in my office on Monday. I'll call you then about next steps on my end as I get up to speed. And I trust in the interim you will forebear from filing anything in court so we have a full and fair opportunity to review the

matter.

Much appreciated,

Randy Mastro

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

# Exhibit B



**From:** Judd Burstein <JBurstein@BURLAW.COM>
**Sent:** Monday, April 17, 2017 3:13 PM
**To:** Mastro, Randy M.
**Subject:** Tantaros

I am sending this to you without having gone through the fine print with my clients, but there should be minimal changes on our end.

I know I am asking for a big number. So if your client believes that he is innocent and can withstand the discovery process, he should just reject my proposal, and we can litigate starting Wednesday.

I wish I had the freedom to be more generous with timing, but it is out of my hands.

Best, Judd.

## SETTLEMENT AND RELEASE AGREEMENT

**AGREEMENT** made this 18th day of April, 2017, by and between (a) Andrea Tantaros ("Tantaros") and (b) Peter A Snyder and Disruptor, Inc. (collectively "Disruptor") (and collectively with Tantaros, the "Parties"):

**WHEREAS**, Tantaros has informed Snyder that she intends to commence an action against him on April 12, 2017 in the United States District Court for the Southern District of New York seeking compensatory and punitive damages arising from Snyder's campaign, for which Snyder was paid by Fox News, to destroy Tantaros's reputation and cause her great emotional distress through the use of "sock" social media accounts which published false, obscene and abusive posts about Tantaros, including posts based upon information which Snyder knew to be the fruits of Fox News's illegal electronic surveillance of Tantaros; and

**WHEREAS**, Snyder denies all Tantaros's allegations; and

**WHEREAS**, Snyder nonetheless wishes to avoid the expense, time demands and negative publicity that will flow from Tantaros's planned lawsuit;

**NOW, THEREFORE**, in return for the mutual covenants and promises set forth herein, the parties agree as follows:

1.     In full satisfaction of any and all claims that Tantaros has or may have against Disruptor, Disruptor shall wire, no later than 5:00 pm on April 18, 2017, FIFTEEN MILLION DOLLARS (US $15.000,000) to CITIBANK, 90 Park Avenue, NY, NY 10016, ABA#021-001486, Account No. 028081628, Account Name: Judd Burstein, P.C. Escrow Account.

2.     Tantaros agrees that in any litigation or arbitration ("proceeding") in which she pursues any claims against third parties arising from any alleged conduct by Disruptor: (a) Disruptor shall only be identified in all pleadings as a "third party contractor employed by Fox

News" (b) Tantaros will agree to conduct all discovery with respect to Disruptor pursuant to a confidentiality agreement which will strictly limit the use or dissemination of any documents or testimony obtained from Disruptor to the subject proceeding, (c) any motions or submissions by Tantaros will refer to Disruptor as a "third party contractor employed by Fox News" unless, such as in the case of a summary judgment motion or a motion concerning discovery sought from Disruptor, it is necessary to identify Disruptor by name, and (d) Tantaros will initially file all motions which reference Disruptor under seal, so as to give Disruptor an opportunity to move (without opposition from Tantaros) to continue the seal.

3.      Other than in a proceeding, Tantaros shall not discuss or even mention Disruptor's name other than to professionals employed by her or to her family.

4.      Other than in a proceeding, Disruptor shall not discuss or even mention Tantaros' name other than to professionals employed by Disruptor or to Pete Snyder's family.   This Paragraph 4 shall be construed to include any mention of Tantaros in any social media account maintained, hired or controlled by Disruptor.

5.      If Tantaros is served with a subpoena by any third party, she shall give Disruptor notice of such subpoena as soon as practicable, and shall seek additional time to respond to any such subpoena so that Disruptor can seek to limit or quash the subpoena.

6.      If Disruptor is served with a subpoena by any third party, it shall give Tantaros notice of such subpoena as soon as practicable, and shall seek additional time to respond to any such subpoena so that Tantaros can seek to limit or quash the subpoena.

7.      Except with respect to the obligations set forth in this Agreement, (a) Pete Snyder, his heirs successors and assigns, and (b) Disruptor, Inc., its present and former affiliates, subsidiaries, related entities, employees, officers, directors, agents, representatives, and attorneys

("Disruptor Parties") hereby release Tantaros, her heirs, successors and assigns (Tantaros Parties")
from any and all claims, demands, causes of action, rights, liens, losses, damages, obligations, and
liabilities of any kind or character, whatsoever (whether known, unknown, or suspected or not
suspected), at law or in equity, or otherwise, which the Disruptor Parties may now have or claim
to have or to have acquired, against any of the Tantaros Parties, by reason of any matter, thing,
event, condition, fact, circumstance or transaction occurring from the beginning of time to the date
this Agreement is executed.

8.      Except with respect to the obligations set forth in this Agreement, the Tantaros
Parties hereby release the Disruptor Parties from any and all claims, demands, causes of action,
rights, liens, losses, damages, obligations, and liabilities of any kind or character, whatsoever
(whether known, unknown, or suspected or not suspected), at law or in equity, or otherwise, which
the Tantaros Parties may now have or claim to have or to have acquired, against any of the
Disruptor Parties, by reason of any matter, thing, event, condition, fact, circumstance or transaction
occurring from the beginning of time to the date this Agreement is executed.

9.      The parties each represent that they are entering into this Agreement knowingly
and voluntarily, free of any duress or coercion.

10.     Disruptor has been represented by the law firm of Gibson, Dunn & Crutcher, which
has advised Disruptor as to the meaning and effect of this Agreement, and has further answered
all questions which Disrupter has asked about this Agreement.

11.     Tantaros has been represented by the law firm of Judd Burstein, P.C. which has
advised Disruptor as to the meaning and effect of this Agreement, and has further answered all
questions which Tantaros has asked about this Agreement.

12.     This Agreement shall be governed by the internal laws of the State of New York without regard to any conflicts of law principles.

13.     Each of the Parties irrevocably consents to the personal jurisdiction of the Courts of the State of New York

14.     Any disputes arising out of or in any way related to this Agreement **must** be submitted **exclusively** to the United States District Court for the Southern District of New York or, if that Court does not have subject matter jurisdiction, to the Supreme Court of the State of New York, New York County.

DISRUPTOR, INC.


By_____                              _____

                                                     PETE SNYDER


_____

ANDREA TANTAROS

# Exhibit C



**From:** Mastro, Randy M. <RMastro@gibsondunn.com>
**Sent:** Tuesday, April 18, 2017 7:45 PM
**To:** Judd Burstein
**Subject:** Andrea Tantaros

It is profoundly disappointing to me that you and your client (Andrea Tantaros) are conducting yourselves this way. Let me recap where things stand.

First, on April 10, you sent our client, Pete Snyder, direct email communications, in which: (i) you personally threatened to file a lawsuit against him "within the next week;" (ii) you made accusations in that email about his personal life that have nothing to do with the viability of any legal claim you may bring on behalf of your client; (iii) you accused him of conducting an "ongoing abusive, disturbing, exploitative and frankly, horrific social-media influence campaign targeting Andrea Tantaros on behalf of Fox News under the direction of Bill Shine and Roger Ailes," even though Pete Snyder long ago sold his social media company (New Media Strategies) and has done no social media-related work for Fox in many years, let alone any "ongoing" activity relating to Andrea Tantaros; (iv) you therefore cannot possibly have any good faith basis for asserting any claim of "intentional infliction of emotional distress and prima facie tort" against Pete Snyder that would survive dismissal on the merits, under the applicable one-year statute of limitations, or both; and (v) you claimed you would file this lawsuit "in the Southern District of New York," even though you were already ordered by a New York state court judge to abide by the agreement your client signed with Fox to arbitrate any such claims under strict

confidentiality and are obviously now trying to evade that ruling in order to generate publicity adverse to Pete Snyder and others through a public filing in a transparent attempt to pressure settlement.

Next, you and I spoke on the telephone yesterday morning, I requested you forebear filing for a week while we continued to talk, you told me you knew of a negative Salon article about my client that would be coming out imminently -- obviously, because you had helped generate the story, which appeared this morning, in furtherance of your pressure campaign -- and you assured me that you would encourage your client to give us time to talk further.

Imagine my surprise, then, when you got back to me by email yesterday afternoon, informed me you could not convince your client to hold off, and then demanded $15M to settle the case.

I've seen some high-handed maneuvers over the years, but this one takes the cake. You apparently like to send "legal notice" emails like the one you sent to our client last week. So let this serve as notice to you and your client: I will not let our client be shaken down by you and your client; to our knowledge, our client has done none of the things you claim he has been doing over the past year on an "ongoing" basis "on behalf of Fox News under the direction of Bill Shine and Roger Ailes;" you and your client have no good faith basis for alleging in court any such thing; and we intend to hold you and your client accountable if you proceed with any such bad faith public filing.

---

**From:** Judd Burstein <JBurstein@BURLAW.COM>
**Sent:** Monday, April 17, 2017 3:13 PM
**To:** Mastro, Randy M.
**Subject:** Tantaros

---

I am sending this to you without having gone through the fine print with my

clients, but there should be minimal changes on our end.

I know I am asking for a big number. So if your client believes that he is innocent and can withstand the discovery process, he should just reject my proposal, and we can litigate starting Wednesday.

I wish I had the freedom to be more generous with timing, but it is out of my hands.

Best, Judd.

# Exhibit D





Begin forwarded message:

**From:** Judd Burstein <JBurstein@BURLAW.COM>
**Date:** April 10, 2017 at 12:38:17 PM EDT
**To:** "Pete@Disruptor.com" <Pete@Disruptor.com>
**Subject: Corrected version (for typos) of my prior email**

Dear Mr. Snyder:

As you are probably already aware due to the nature of your work, I am the attorney for Andrea Tantaros.

I am writing to you directly because I do not know if you are represented by counsel and, if so, who that counsel may be.  If you are represented by counsel, please forward this email to him or her, with a copy to me so that I will know who I should communicate with going forward.  **If you are not represented by counsel, and prefer to deal directly with me, I want to make it clear that nothing I *ever* say or do should be construed by you as an action taken for your benefit or in any way to further your interests.   To the contrary, everything I do or say vis a vis you is solely for the benefit of my client, and contrary to your interests.**

With this said, the purpose of my communication today is to inform you that I am in the process of drafting a complaint that I will file within the next week against you based upon your ongoing abusive, disturbing, exploitative and frankly, horrific social-media influence campaign targeting Andrea Tantaros on behalf of Fox News under the direction of Bill Shine and Roger Ailes.

I have received reliable information that, in the face of media inquiries about your work,  you are desperately trying to save your reputation by covering your tracks with respect to New Media Strategies's and Disruptor Capital's use of, inter alia, www.girlsoffox.com (and many other websites, twitter accounts and blogs) as "weaponized" digital tools for Fox News, Roger Ailes, and Bill Shine.

What the general public has yet to learn, however, is that after leaving New Media Strategies, you have continued your work of creating outrageously abusive and salacious fake social media campaigns against various "enemies," including Ms. Tantaros, identified to you by Bill Shine at the direction of Roger Ailes.

I intend to attach to my complaint a huge number of posts, tweets, blog commentaries, and other materials traceable to you and your contractors, and I have no doubt that the discovery tools afforded by the Federal Rules of Civil Procedure will provide even more evidence of your misconduct.  The use of tools such as robots.txt files may work in covering your tracks with media, but they will fail with a federal judge.

Given your history of black-out drinking, perhaps you may not remember - though I am certain your wife, Burson, does - the conversation you had with Ms. Tantaros at your Nantucket home in August of 2013, as well as the detailed conversations you had with her when you unsuccessfully sought to hire her to head a new public affairs division at New Media Strategies -- a position ultimately accepted by Jessica Boulanger.  In these conversations you explained your use of sock puppet accounts, fake websites and internet trolling to accomplish Fox News's goals.  Significantly, in your August 2013 discussion with Ms. Tantaros, you admitted that you were now using Disruptor Capital to continue the work you had done for Fox News through New Media Strategies.

That you would make these admissions to Ms. Tantaros about the work you did for Fox News (but not against Ms. Tantaros at the time) is entirely credible considering the facts that:

(A)     Ms. Tantaros worked with your wife in Washington;

(B)     You and your wife were close enough with Ms. Tantaros to have her as a recurring guest in your home in Nantucket.  Indeed, during her last visit there in August of 2013, while your pregnant wife slept, you drunkenly and repeatedly "hit on" Ms. Tantaros, causing her to leave your home immediately the next morning -- never to return; and

(C)     You used to secretly forward emails between you and Bill Shine to Ms. Tantaros.   Moreover, your widely-known drinking problem makes it all the more likely that you were incredibly indiscreet.

If you would like to explore a possible pre-litigation settlement of Ms. Tantaros's claims, you or your lawyer should reach out to me.  In assessing your vulnerability, please do not be misled into concluding that I will be proceeding based upon the erroneous notion that 18 U.S.C. § 2261A provides a private right of action.  Although your violation of federal criminal law will provide compelling support for Ms. Tantaros' punitive damages claim, we will be suing in the Southern District of New York for intentional infliction of emotional distress and prima facie tort.  See Dennis v. Napoli, ___ A.D.3d ___, 2017 WL 887713 (1st Dep't 2017).

In the event that you choose to exercise some common sense, I look forward to hearing from you or your lawyer.


Judd Burstein
Judd Burstein, P.C.
1790 Broadway
New York, New York 10019
(212) 974-2400
(212) 974-2944 (Fax)
(917) 687-2981

# Exhibit E

**From:** Andrea Tantaros <atantaros@gmail.com> **Date:** Wednesday, September 11, 2013 at 9:47 PM **To:** Pete Snyder <pete@disruptor.com> **Subject:** Re: info

Terrific. Joe sent dial in info to you. Talk then.

On Wed, Sep 11, 2013 at 4:37 PM, Pete Snyder <pete@disruptor.com> wrote:

**Sure — can do noon tomorrow.**

**Pete Snyder**
**CEO Disruptor Capital (T)** 703.659.1100  **FB:**
FACEBOOK.COM/PETESNYDER **TW:** @PETESNYDER www.DIS
RUPTOR.COM

**From:** Andrea Tantaros <atantaros@gmail.com> **Date:** Wednesday, September 11, 2013 12:24 PM **To:** Microsoft Office User <Pete@disruptor.com> **Subject:** Re: info

I'd love a call. Could we make noon ET/9am PST work tomorrow? Joe and Tim would like to join. AJ has provided a lot more info to me, as well. Looks like there are a number of consultant options and there are ways to get syndicators like Compass to do the ad sales and affiliate work while we still own the show. We might not have as much flexibility with larger syndicators who will likely want to control more but this can all be discussed. There are a number of ways, like a buffet, it can be done. AJ would also be a good option to manage operations on the project along with the consultant, you and me. Then built out to a larger brand as we talked about.

If the time doesn't work can you send some other options that work for you?

On Wed, Sep 11, 2013 at 11:21 AM, Pete Snyder <pete@disruptor.com> wrote:

Amen to that.   Think it would be wise to cobble together a "if you want to own your own thing, here's what it would take" plan.  Will show upfront costs - then what the payoff will / can be if we execute properly in the future.  My guess - there are substantial to huge benefits to this mid and long term - coupled w some short term disadvantages (ie its a start up not a rolls royce operation w all the bells and whistles).  Again I'd be aiming higher - at media company vs just your show.  Happy to continue the convo and/or plan a time to pow wow together.  P

**From:** Andrea Tantaros <atantaros@gmail.com> **Sent:** Wednesday, September 11, 2013 8:51:35 AM **To:** Pete Snyder **Subject:** Re: info

He says he can now pay us. No money yet. But I still need to think of exit strategy.

On Tue, Sep 10, 2013 at 10:34 PM, Pete Snyder <pete@disruptor.com> wrote:
Great talking yesterday - tx for sending - anything new?
Pete Snyder
CEO
Disruptor Capital
  On Sep 9, 2013, at 8:07 PM, "Andrea Tantaros" <atantaros@gmail.com> wrote: > Pete, > > I am putting together a list of consultants. There are some good names out there. AJ is helping think of more. > > As for the monthly cost of the A-town show, here is what I am estimating: > > EP, AJ Rice - $8708/month > > Producer, Christopher Coffey  - $4200/month > > Matt Fox, sound engineer - 10k/month (Matt quit, BTW, and found a new job so we would need to hire someone else til we can get him back, likely at a cheaper rate). > > Host - 24,999.99/month plus rent stipend for studio in apt - $2750.00 > > Call screener - I am guessing he is paid very little bc it's a part time job - We could probably train Coffey to do that or an intern to save money. We can be lean and mean. Can't be more than 30k/year. > > There is also an engineer in Oregon who puts us all up and connects us. But if we find a good sound engineer, they can probably do that, too. > > Total

roughly is $55,657.97 > > As for someone to set up the technical side, Mark fired a guy named Douglas who is excellent. He is in Oregon but he came here and set me up in my apartment in NYC. He wants to move here, too. In a perfect world we'd get him to run operations. I know a sound engineer at Fox Talk Radio who wants to quit and come work for me so I could fill Matt's job for much cheaper. > > Let me know what else you need. > > AT >

# Exhibit F

**From:** Andrea Tantaros <atantaros@gmail.com> **Date:** Monday, February 24, 2014 at 1:39 PM **To:** Pete Snyder <pete@disruptor.com> **Subject:** <no subject>

Pete - take a look and edit where you see fit. Also if you want me to mention you or wait til we're in person.

####

Hi Roger,

Spent some time this weekend talking about the sale of Whatsapp to Facebook for $19 billion. Most people at FNC likely don't even know what Whatsapp is, yet 450 million people are subscribers.

It got me thinking about what the channel can do to not just keep up, but also be an industry leader in how people watch TV/cable news. ESPN has an excellent model for this and they have made millions.

With Newscorp's acquisition of Storyful, a company that digs up and verifies news from sources like You Tube and Instagram. This model would not be difficult to replicate and monetize. In fact, it's a Ferrari engine when all we really need to do it would be a Lexus.

I don't have to tell you we are getting lapped in the online space. It's ok to have anchors promote Facebook pages and twitter handles but it isn't adding a dime to our bottom line or helping us truly stay ahead of the curve.

This is from the Washington Post on Sunday and is very telling:

Netflix believes that, in the future, consumers will subscribe to individual "channels" such as Netflix, Hulu and HBO Go and access them online. "Over the coming decades and across the world, Internet TV will replace linear TV," the company boasts on its Web site. "Apps will replace channels, remote controls will disappear, and screens will proliferate. As Internet TV grows from millions to billions, Netflix is leading the way."

I know I offered to help the channel a few weeks back when we met, and would love to talk to you more about this. If you're open to it I could put together a business plan for you to review that could contain some ideas for FNC.

Andrea

# Exhibit G

8. <u>ARBITRATION</u>:

        Any controversy, claim or dispute arising out of or relating to this Agreement or your employment shall be brought before a mutually selected three-member arbitration panel and held in New York City in accordance with the rules of the American Arbitration Association then in effect. The arbitrators shall issue a full written opinion setting forth the reasons for their decisions. Such arbitration, all filings, evidence and testimony connected with the arbitration, and all relevant allegations and events leading up to the arbitration, shall be held in strict confidence. Judgment may be entered on the arbitrators' award in any court having jurisdiction; however, all papers filed with the court either in support of or in opposition to the arbitrators' decision shall be filed under seal. Breach of confidentiality by any party shall be considered to be a material breach of this Agreement.

# Exhibit H

1

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK : CIVIL TERM  PART 58
 2    ------------------------------------------X
      ANDREA TANTAROS,
 3                              Plaintiff,

 4              - against -

 5    FOX NEWS NETWORK, LLC, ROGER AILES,
      WILLIAM SHINE, DIANNE BRANDI, IRENA
 6    BRIGANTI, and SUZANNE SCOTT,
                              Defendants.
 7    ------------------------------------------X
      INDEX NO. 157054/16         111 Centre Street
 8                                New York, New York
                                  February 15, 2017
 9    BEFORE:

10          THE HON. DAVID B. COHEN, J.S.C.

11

12    APPEARANCES:

13    FOR THE PLAINTIFF:

14    JUDD BURSTEIN, P.C.
      5 Columbus Circle
15    New York, New York  10019

16    FOR THE DEFENDANTS:

17    DECHERT LLP
      1095 Avenue of the Americas
18    New York, New York  10036
      BY: ANDREW J. LEVANDER, ESQ.
19        LINDA C. GOLDSTEIN, ESQ.

20    QUINN EMANUEL URQUHART & SULLIVAN, LLP
      51 Madison Avenue, 22nd floor
21    New York, New York  10010
      BY: PETER CALAMARI, ESQ.

22

23

24                         JACK L. MORELLI
                           Senior Court Reporter
25
```

2

## PROCEEDINGS

1    THE COURT:  Good afternoon.  This is Andrea

2   Tantaros against Fox News Network, LLC, Roger Ailes,

3   William Shine, Dianne Brandi, Irena Briganti and Suzanne

4   Scott, under Supreme Court index 157054 of 2016.  Starting

5   with plaintiff's counsel, put your appearance on the

6   record.

7    MR. BURSTEIN:  Good afternoon, Your Honor.  Judd

8   Burstein, of Judd Burstein, P.C., for the plaintiff.

9    MR. LEVANDER:  Your Honor, good afternoon.

10  Andrew Levander with Linda Goldstein, from Dechert.  We

11  represent Fox and the other individuals except for Roger

12  Ailes.

13    MR. CALAMARI:  Peter Calamari, and sitting in

14  the box is Joseph Sarles, from Quinn Emanuel, and we

15  represent Roger Ailes.

16    THE COURT:  Did you want to put your additional

17  members or associates on the record as well or at least

18  their names?

19    MR. LEVANDER:  I think that's fine, Your Honor.

20    THE COURT:  Okay.  I read the papers, I'm ready

21  for argument.  At this time who is arguing for Fox, Mr.

22  Levander?

23    MR. LEVANDER:  Yes, Your Honor.

24    THE COURT:  You may procedure.

25    MR. LEVANDER:  Thank you, Your Honor.  May it

- J L M -

3

### PROCEEDINGS

1    please the Court, the motion before the Court, as the

2    Court undoubtedly is aware, concerns a broad arbitration

3    clause in an employment contract.  Ms. Tantaros was very

4    sophisticated, she signed that employment contract with

5    Fox containing that express broad arbitration clause not

6    once but twice, and she was represented by a sophisticated

7    talent agency.

8             THE COURT:  By broad you mean it doesn't

9    reference any specific types of claims in it?

10            MR. LEVANDER:  Correct.

11            THE COURT:  That's one of the plaintiff's

12   arguments, isn't it, that that is the failing of this

13   clause?

14            MR. LEVANDER:  Yes, but that's not the law.  But

15   if you want me to get to that right now I can, but I was

16   going to build my way there.  But I'm happy to fire away.

17            THE COURT:  As you wish, counsel, we'll get to

18   it.

19            MR. LEVANDER:  The broad clause does say, any

20   controversy, claim or dispute arising out of or relating

21   not only to the agreement but her employment, and any such

22   claim has to be arbitrated.  Under both federal and state

23   law that provision needs to be enforced.  Indeed there is

24   a strong policy in favor of arbitration reflected in the

25   CPLR, Federal Arbitration Act and a plethora of cases over

- J L M -

PROCEEDINGS

4

1    the last 50 ~~year~~ *years* or more, including the New York Court of

2    Appeals case in Smith Barney versus Luckie, which the New

3    York Court of Appeals directed the lower courts to

4    "rigorous judicial enforcement of arbitration agreements."

5    The Westinghouse case, New York Court of Appeals did the

6    same, and the Supreme Court of the United States has also

7    issued its opinions.  I'm talking about the strong policy

8    in favor of arbitration.

9         THE COURT:  Is that the Hirschfeld case you're

10   referring to?

11        MR. LEVANDER:  That's the New York Court of

12   Appeals case.  Supreme Court of the United States would be

13   Moses Cone Memorial Hospital, it would be

14   Shearson/American Express versus McMahon.  There is a

15   plethora of cases, Your Honor.  Indeed the 2nd Circuit has

16   observed in Arciniaga versus General Motors, 460 F.3d at

17   page 234, "It is difficult to overstate the strong federal

18   policy in favor of arbitration."  And that's the law in

19   New York as well.

20        Based on those cases, those principles and the

21   authority on point that I will now discuss, we believe

22   that the motion to compel arbitration should be plainly

23   granted.  Indeed, Your Honor, plaintiff has flouted the

24   terms of her contract, including the arbitration clause,

25   in bringing this case, in the various publicity stunts she

- J L M -

PROCEEDINGS

5

1    has engaged in.

2          The argument that they make, however, ignores

3    overwhelming precedent.  I will focus on the three issues

4    that counsel raises, as I understand them, as to why she

5    should be allowed out of her arbitration clause and to be

6    able to litigate in court.

7          As I understand it, her first argument is,

8    although I'm compelled to arbitrate certain claims, I

9    don't have to arbitrate sexual harassment claims.  And

10   that's because the words sexual harassment don't appear in

11   the broad clause, as Your Honor referenced a few moments

12   ago.  That is simply not the law.  Plaintiff does not cite

13   a single case in which a Court has held that a broad

14   employment arbitration clause in an employment agreement

15   that encompasses any claim relating to her employment,

16   does not encompass sexual harassment, whether or not the

17   arbitration clause contains the words sexual harassment,

18   it's just not a requirement of the law to the contrary.

19         She cites a couple of cases in which the Court

20   has noted the full term of the language that the _clauses_

21   arbitration clause, and some arbitration ~~clause~~ do have

22   ~~Things~~ like any claim including but not limited to.  But,

23   for example, in Cicchetti versus Davis, which is a

24   Southern District case in 2003, but the --

25         THE COURT:  Isn't it sufficient if a clause says

- J L M -

6

## PROCEEDINGS

1    essentially the same thing as her clause, if it says any

2    claim and specifies a few, isn't that essentially the

3    same?

4           MR. LEVANDER:  In our view it's exactly the same

5    whether it says including but not limited to or it doesn't

6    have the including but not limited to, any claim means any

7    claim and that's what we have here.

8           Indeed, in Cicchetti, one of the cases she

9    relied on, while it drops a footnote that says, "The

10   language has the including but not limited to sexual

11   harassment."  The analysis of the Court was that it was

12   because the arbitration clause related to "all her

13   employment."  Precisely what the arbitration clause in

14   this case does.

15          As I said, Mr. Burstein has not cited a single

16   case in which a Court has said, okay, you have a broad

17   thing that says any claim relating to employment.  But you

18   didn't put in the words sexual harassment and therefore,

19   we're not going to allow arbitration of the sexual

20   harassment claim; not a single one.

21          Indeed, in Tong versus S.A.C. Capital

22   Management, which is a 1st Department case from 2008 which

23   you cited in approval in your Siroy, decision recently,

24   "The clause that was held to encompass claims under both

25   the New York State and the New York City Human Rights

                      - J L M -

PROCEEDINGS                                    7

1    Laws," exactly the claims that are in this case, "was

2    exactly the same as the clause in our case relating to

3    anything under your employment agreement." No reference

4    to sexual harassment. Nonetheless, the 1st Department

5    ordered, compelled arbitration.

6                THE COURT: But how does the contract alleged

7    fall within the scope of employment?

8                MR. LEVANDER: That's simple, Your Honor, if you

9    just read the complaint. And the complaint, I will

10   particularly refer you to, and that's the whole thing, but

11   if you look at paragraphs 14 through 18 --

12               THE COURT: I've read the complaint, counsel.

13               MR. LEVANDER: It says, "Every act that occurred

14   here occurred on the premises."

15               THE COURT: In New York.

16               MR. LEVANDER: Of Fox in New York.

17               THE COURT: I know.

18               MR. LEVANDER: And the claims are all based on

19   our status as an employer. So this is quintessentially an

20   employment place claim. This is not -- you know, he cites

21   as an exception the case, for example, where an employee

22   is off premises and there is a social interaction not part

23   of business and a sexual assault is alleged. That's not

24   what this case is about. What this case is about is,

25   allegedly systematic conduct at Fox, at the news station,

                          - J L M -

8

## PROCEEDINGS

1       that sexual harassment. And if it wasn't related to --

2                  THE COURT: Are you contending that if the

3       sexual assault took place in Fox's premises that that

4       would fall within the scope of employment?

5                  MR. LEVANDER: I actually think it would. But

6       we don't have to cross that bridge in this case. The case

7       here is, the only way we're liable is as an employer.

8       This is quintessentially an employment case, therefore it

9       is encompassed. And even Mr. Burstein doesn't make that

10      argument -- but if he did make the argument that it was

11      unrelated to employment, he would automatically lose his

12   -  New York State, New York City Human Rights Law claims       .

13      because they are only bringable [sic] against an employer.

14                 So, the same is true in the 2nd Circuit's case

15      called Oldroyd, 134 F.3d 72. And there the holding was a

16      federal statutory whistleblower claim is encompassed by an

17      arbitration clause that says, "Any claim arising under the

18      employment agreement." No reference to harassment. No

19      reference to whistleblower. No reference to anything

20      else, just a broad clause; exactly as we have here.

21                 We've cited to Your Honor a host of other cases

22      which uniformly hold the same thing. There is a Fox case,

23      there is a Gateson case, there is a Valdes case, all in

24      the Southern District, in which arbitration has been

25      compelled in harassment cases based on a clause that is

- J L M -

9

PROCEEDINGS

1    identical or indistinguishable from the clause in our case

2    which is, "Any claim, controversy or dispute relating to

3    your employment agreement or your employment."

4             The cases apply this principle uniformly.  For

5    example, Mr. Burstein cites the Coors case in the 10th

6    Circuit.  But the Coors case is exactly on point.  It's

7    not a harassment case, it's an antitrust case.  There it

8    says, any claim relating to the contract.  The Court says,

9    well, you're compelled to.  In the antitrust case cited in

10   the Supreme Court case in Mitsubishi, Supreme Court of the

11   United States saying, you've got -- it doesn't matter that

12   it doesn't say antitrust, it's related to the contract.

13   End of story, you go arbitrate.  That is the federal

14   policy that's involved here.  Indeed, Your Honor, your

15   Siroy decision, I believe --

16            THE COURT:  Which you smattered through the

17   brief at every opportunity.

18            MR. LEVANDER:  I may not have done it enough but

19   I tried.  But I think that it's pretty on point.  In Siroy

20   there was a forum selection clause which is similar to

21   a --

22            THE COURT:  But not the same.

23            MR. LEVANDER:  Not the same.  But you cited a

24   bunch of the arbitration cases that are on point.

25            THE COURT:  But there aren't a lot of forum

- J L M -

PROCEEDINGS

10

1   selection clauses.

2          MR. LEVANDER:  But the principle was that was a

3   forum selection clause which said any claim.  It didn't

4   include the sexual harassment claim.  But you said

5   nonetheless, this case gets shipped to New Jersey, I

6   believe it was.  And you cited, even though there was no

7   reference to sexual harassment in the clause, and you

8   cited Tong, the 1st Department case I mentioned a moment

9   ago which is right on point and I think controlling here.

10  The petition of Levitt, another arbitration case in which

11  the same principle applied and you cited those two cases

12  with approval as compelling your decision.

13          Now, there is also a suggestion in his brief

14  that somehow because it's sexual harassment that deserves

15  to be in a courtroom notwithstanding the arbitration

16  clause, and that doesn't fly.  In fact, the Supreme Court

17  in 1991 in the Gilmore case specifically threw that

18  principle out, rejected it and says, "Harassment claims by

19  any other claims, discrimination claims, should be heard

20  pursuant to arbitration if that's what the clause covers."

21  And the New York Court of Appeals followed Gilmore shortly

22  thereafter in Fletcher versus Kidder Peabody, a 1993

23  decision which, again, ironically, Mr. Burstein cites in

24  his brief with approval.

25          Indeed, in Guyden versus Aetna, 544 F.3d in the

- J L M -

11

**PROCEEDINGS**

1    2nd Circuit 2008, the Court specifically held, "That the

2    inability of an employee to publicly air their

3    whistleblower claim under statute does not give rise to

4    vitiating an arbitration clause." Right on point.

5            Second argument that he makes, as I understand

6    it, even he describes it is unprecedented, I would

7    describe it as frivolous, the notion that after the

8    arbitration clause was signed, two years later after there

9    is a torrent of public stunts and public appearances by

10   plaintiff and her lawyer, in which even Mr. Burstein

11   acknowledged that he would probably be violating the

12   contract of his client, that the Fox News issued a

13   statement that said, "We've already filed an arbitration

14   claim against Ms. Tantaros."

15           THE COURT: Now, did that claim make it into the

16   news? It seemed like it may not have, right?

17           MR. LEVANDER: If it was -- it did not.

18           THE COURT: Did that get reported in the end?

19           MR. LEVANDER: I never saw it.

20           THE COURT: Okay.

21           MR. LEVANDER: Whatever one's view of whether or

22   not that anodyne statement is a violation of the

23   confidentiality agreement in a contract, that's a contract

24   claim that must be arbitrated, not a basis to vitiate an

25   arbitration clause.

                         - J L M -

12

## PROCEEDINGS

1    THE COURT:  So, you send to arbitration a claim

2    as to whether or not arbitration was vitiated by some

3    waiver?

4         MR. LEVANDER:  No, we've made an arbitration

5    claim based on the fact that she published a book without

6    getting preapproval and said that violated her contract.

7    That's our pending arbitration claim.  They then brought

8    this case and in response to we issued -- after they were

9    on TV, radio, newspaper --

10        THE COURT:  Then you brought this motion?

11        MR. LEVANDER:  And then we brought this motion.

12   We never litigated anything about the defense of this

13   case.  We've never done anything but immediately bring an

14   action to compel arbitration.  The only way --

15        THE COURT:  But how do you respond to

16   plaintiff's argument that you waived your right to compel

17   arbitration under the arbitration clause by violating the

18   confidentiality of the arbitration?

19        MR. LEVANDER:  Because the case law is

20   overwhelming.  Waiver only occurs when you litigate, okay?

21   Making a statement is not litigation.  Actually litigate,

22   protracted litigation is the standard which actually

23   prejudices the other party.  I can cite, those are the

24   exact words of the PPG Industries versus Webster case in

25   the 2nd Circuit, Thyssen versus Calypso Shipping in the

- J L M -

PROCEEDINGS

13

1   2nd Circuit, and the New York Court of Appeals decision in

2   Cusimano versus Schnurr.  In fact, in Cusimano the New

3   York Court of Appeals emphasized that the waiver turned on

4   the protracted use of the courts.  A statement

5   out-of-court is not the use of the courts to the actual

6   prejudice of the other party.  That's the standard and

7   that didn't occur here.  Nothing was prejudicial.

8        THE COURT:  Counsel, two more minutes and I

9   think that you probably want to get to the claim as to the

10  individuals.

11       MR. LEVANDER:  Yes, I do.

12       THE COURT:  Because you have several of them as

13  well.

14       MR. LEVANDER:  Yes.  So, I also just want to

15  point out before I do though, that there are at least two

16  very good cases to read about that, "All acts of the

17  parties subsequent to the making of the contract which

18  raised issues of facts or law lie exclusively with the

19  arbitrator."  Here you have a post-contract statement, in

20  fact, a post-arbitration statement.  That's their basis,

21  it goes to the arbitrator.  We violated the contract, the

22  arbitrator can find that.  Finally, you can't avoid an

23  arbitration clause by suing your employer, that's Black

24  Letter Law also.

25       In Hirschfeld Products, which Your Honor

- J L M -

**PROCEEDINGS**

14

1    referred to earlier, against Mirvish, the 1st Department

2    which was subsequently affirmed by the Court of Appeals

3    explained there, "The attempt to distinguish officers and

4    directors from the corporation they represent for the

5    purposes of evading an arbitration provision is contrary

6    to the established policy of this state." Subsequently in

7    the Court of Appeals, the Court of Appeals affirmed that

8    holding and said, that under New York and federal law the

9    arbitration clause of the employer extends to quote, "Any

10   agent of the employer." 88 NY2d at 156.

11           More recently still in DiBello versus Salkowitz

12   in the 1st Department, the Court held, "The enforceability

13   of the arbitration agreement is not affected by the

14   statutory nature of the discrimination claims. And given

15   the employment related nature of the claims, the

16   individual employee defendant as an agent of the employer

17   is entitled to demand arbitration of the claims against

18   him, no less than the employer is entitled to demand

19   arbitration of the claims against it. That is the 1st

20   Department's holding in DiBello.

21           The 2nd Circuit has numerous cases holding to

22   the same effect, including Ragone and Powers. Indeed, in

23   the 2nd Circuit in Roby versus Lloyd's, which is one of

24   the cases you cited with approval in Siroy, the Court

25   stated, 2nd Circuit stated, "In this and other circuits

- J L M -

15

## PROCEEDINGS

1   consistently have held that employees of any entity,

2   employee of any entity that is party to an arbitration

3   agreement are protected by that agreement."

4           The 2nd Circuit has also emphasized that when

5   you're moving to compel arbitration the standard is even

6   easier if the party that you were moving to compel against

7   is the one that signed. So here she signed, she agreed to

8   arbitration. Any claim to avoid arbitration is less

9   strong under those circumstances.

10          THE COURT: You may conclude, counsel.

11          MR. LEVANDER: I'm going to hold the rest of my

12  time for rebuttal. Thank you.

13          THE COURT: You may be seated.

14          Mr. Calamari.

15          MR. CALAMARI: Yes, Your Honor, I'll be very

16  brief. I just join in the arguments of Mr. Levander. The

17  cases are absolutely clear here. There is just no law to

18  support the position of plaintiff's counsel. And I'll, if

19  I may, reserve my time for rebuttal.

20          THE COURT: I believe we reserved three minutes

21  for rebuttal on the defense side.

22          MR. LEVANDER: Thank you, Your Honor.

23          THE COURT: Okay. I think that you probably

24  were a minute under, so I'll give you that additional

25  minute if you need it, okay?

                        - J L M -

## PROCEEDINGS

1        Mr. Burstein, you're up.

2        MR. BURSTEIN:  I'll try and talk quickly and try

3   and work backwards.  I don't dispute that there is a

4   presumption in favor of arbitration.  But I also I don't

5   think that the other side can dispute that one shouldn't

6   have to arbitrate if you haven't agreed to arbitrate.

7   Although there are many cases that say that an employer,

8   an employee can be required to arbitrate against other

9   executives, for example, when there is a broad arbitration

10  clause; this case is different.  Everybody is pointing to

11  Siroy but let me tell you why Siroy is actually helpful to

12  me.  In Siroy you pointed out three different situations

13  where admittedly in a forum selection clause where another

14  nonparty to the agreement might be entitled to

15  arbitration.  The two that are sort of relevant is

16  third-party beneficiary and the third which is so close

17  that it's all interrelated.  One could argue under normal

18  circumstances that we might fall within the third

19  category, but this case is different.  I don't know if

20  you've seen the entire agreement, Your Honor, and I have a

21  copy.

22        THE COURT:  I've seen all portions of the

23  agreement that were in the papers, so I have everything

24  that's in the record.

25        MR. BURSTEIN:  Okay, well, what's in the record

- J L M -

PROCEEDINGS

17

1   then in our opposition papers is 15.1 of Ms. Tantaros's

2   agreement.  It's one of the exhibits to my ~~affidavit~~.

3   There are so many papers here.       *affirmation*

4           THE COURT:  Is it you're saying 15.1, "This

5   agreement is non-assignable by performer"?

6           MR. BURSTEIN:  Yes.

7           THE COURT:  I'm looking at it.

8           MR. BURSTEIN:  So what 15.1 says is, "That this

9   agreement shall inure to the benefit of Fox's successors,

10  assignees, affiliates."  It says, "As used in this

11  agreement the term 'affiliate' shall mean any company

12  controlling, controlled by or under common control with

13  Fox."

14          THE COURT:  So what that would mean if Fox was

15  acquired, right, and Fox's employees were covered, then

16  the acquiring entity employees would be covered as well,

17  right?

18          MR. BURSTEIN:  No.  Respectfully, I think that

19  if, in fact, there were another provision in this

20  agreement that protected employees, perhaps.  But this

21  provision can only be read one way, that this is an

22  agreement, as some parties do, they have an agreement

23  where they say there are no third-party beneficiaries and

24  this agreement is only for the benefit of certain people.

25  There is no definition of Fox in the agreement to include

- J L M -

PROCEEDINGS

18

1    employees or anyone else.  That's why this case is

2    fundamentally different than any other case, because --

3              THE COURT:  But doesn't this provision deal with

4    issues if Fox is acquired or merges or something else like

5    that?  How does that exclude employees?

6              MR. BURSTEIN:  It does, because it's made a part

7    of the agreement.  And the part of the agreement that it's

8    made a part of are standard conditions of employment.

9    This is an agreement between Fox News and Andrea Tantaros.

10   The agreement includes not only the part that is specific

11   to Ms. Tantaros, but says the standard conditions of

12   employment also apply.  There are all sorts of provisions

13   in here that are not talking about, you know, mergers,

14   they are talking about when a performer can perform

15   services.  What rights the performer has.

16   Indemnification, commissions, Internet restrictions,

17   promotions, injunctive relief.  This is all specific to

18   the employee.  And if an employer --

19              THE COURT:  I think a lot of that stuff is

20   blacked out in the papers.

21              MR. BURSTEIN:  I can give you a full set.

22              THE COURT:  It was redacted for a reason and it

23   wasn't in the papers, so.

24              MR. BURSTEIN:  But it's a public -- I wanted to

25   be careful as to the other side since it's theoretically a

- J L M -

19

## PROCEEDINGS

1   confidential agreement, I didn't want to put in anything

2   other than what was absolutely necessary. But I think

3   that Mr. Levander will agree, that this is not some single

4   part of the agreement. I think it would be helpful to

5   allow me to supplement the record with a copy of the

6   entire agreement. Because you will see that it -- when

7   two parties enter into a contract and they say this is

8   only for the benefit of the two parties, and with respect

9   to Fox it's only with respect to Fox and its affiliates

10  and this is how we define Fox and affiliates, and there is

11  no definition of Fox News. If you look at the first --

12  well, you don't have it but there is no definition of Fox

13  as Fox including its employees.

14          THE COURT: I know you're trying to convince me

15  that this agreement somehow excludes the employees. But

16  it says this agreement is nonassignable by performer.

17  Which means your client can't assign it but Fox can. But

18  it doesn't say anything about whether employees are or are

19  not considered. This deals with the assignment of the

20  agreement to any future entity, which hasn't happened in

21  this case. But it doesn't exclude -- show me how it

22  excludes employees at this time.

23          MR. BURSTEIN: Well, there is one thing where it

24  says it has the right to freely assign. I'm not relying

25  on that language. I'm relying on the language which says,

- J L M -

PROCEEDINGS

20

1    "This agreement shall inure to the benefit of Fox's

2    successors, assignees and affiliates." Affiliates is

3    important, it's not just about selling the company. It's

4    about, for example, I guess, 21st Century Fox or Fox

5    Business News. They could have added "and employee."

6    They could have defined and -- it's interesting, their

7    reply papers are silent on this issue. You can't find

8    anything on it.

9              So it seems to me that the plain language of

10   this agreement, and you see this all the time in

11   agreements when they want to exclude third-party

12   beneficiaries, they want to keep people -- they want to

13   make sure that this is only going to be for the benefit of

14   the parties to the agreement, not give third parties rights.

15   That is precisely what happened. And it's not remotely

16   found in their reply. They've never addressed this issue.

17   So, the record stands with my argument. The reason they

18   haven't addressed this issue is, they know it would be

19   frivolous to address it because that's what the agreement

20   says.

21             Now, there is another important point here, this

22   case, although it was given short shrift of the arguments

23   of mine that were characterized, I didn't quite recognize.

24   But one of the arguments --

25             THE COURT: That's why you get a chance to talk,

- J L M -

21

## PROCEEDINGS

1    counsel.

2              MR. BURSTEIN:  But one of the arguments that I

3    do think is a question of first impression and is very

4    important is the arbitration clause itself.  Now, this is

5    a situation --

6              THE COURT:  This is the waiver claim?

7              MR. BURSTEIN:  It's not a waiver claim.

8              THE COURT:  It's not?

9              MR. BURSTEIN:  It's a breach claim for the

10   following reason.  I mean --

11             THE COURT:  But the breach has to result in a

12   waiver, right?

13             MR. BURSTEIN:  Yes.  Well, excuse of

14   performance.

15             THE COURT:  Let's get to breach.

16             MR. BURSTEIN:  You have, unlike any other kind

17   of agreement I've ever seen, an arbitration clause that

18   has an arbitration clause that has a strict

19   confidentiality provision and says, "The violation of this

20   clause will be a material breach of the agreement."  Now,

21   you'll never see that.  And this is why it's important.

22   The law, if you take the law generally, what do you have?

23   You have a situation where a party claims a contract has

24   been breached or he or she has been defrauded into

25   agreeing to the contract.  The law is very clear, that

                        - J L M -

PROCEEDINGS                                    22

1    doesn't do you any good in terms of getting out of an

2    arbitration agreement unless you can show that the

3    arbitration agreement itself was procured by fraud.

4              THE COURT:  Let's talk about who is in breach

5    here, counsel, because the other side says that you're in

6    breach.  When I say "you," I mean not just your client,

7    your individual involvement in breaching that

8    confidentiality.  Typically in contract claims situations

9    the focus is on who breached first, right?  Who made the

10   initial breach.  Because that often excuses the other

11   party from their breach, doesn't it?

12             MR. BURSTEIN:  Yes, but the complaint --

13             THE COURT:  How does that not apply here?

14             MR. BURSTEIN:  For two reasons.  One, the

15   complaint alleges, and I can give you the paragraph, a

16   prior breach which was the failure to provide a personal

17   assistant over the three years.  And that is --

18             THE COURT:  But that's not a breach of the

19   confidentiality provision or the arbitration clause,

20   right?  That would be subject to arbitration under this

21   agreement.  You agree to that?

22             MR. BURSTEIN:  I agree that would be.

23             THE COURT:  So, if your client wants to bring a

24   claim that she wasn't given her assistant over that period

25   of time, that's subject to arbitration.

                         - J L M -

23

## PROCEEDINGS

1   MR. BURSTEIN: Yes, but my point is this, a

2   general breach of confidentiality -- there is no breach of

3   the confidentiality requirements of agreement and

4   certainly not of that paragraph. It might give rise to

5   some other kind of breach excusing performance or giving

6   rise to damages. But when you have an arbitration clause

7   which says that this is a material breach specifically of

8   this arbitration clause, it relates solely to this

9   arbitration clause, that is different. That's the

10  equivalent of the sort of the converse where you say,

11  okay, parties have disputes. But you can't get out of

12  arbitration unless you can show fraud in the securing of

13  the arbitration agreement. Similarly it's the same

14  concept.

15      THE COURT: But doesn't your client's breach

16  excuse any breach after that?

17      MR. BURSTEIN: No. For a number of reasons.

18      THE COURT: Isn't that Contracts 101?

19      MR. BURSTEIN: No -- I mean, yes, of course it's

20  Contracts 101. But you have to look at the allegations.

21  Again, this is not an issue for the arbitrator. This is

22  an issue as to what this clause means, as to whether or

23  not we're to be forced into arbitration. And the things

24  they say that we said are not breaches of the

25  confidentiality provision in the contract. And they --

- J L M -

**PROCEEDINGS**

24

1      THE COURT:  Are you disputing that if the

2   confidentiality provision is valid and they sought

3   arbitration, that your conduct and the conduct of your

4   client didn't breach that?

5      MR. BURSTEIN:  Yes.

6      THE COURT:  How?

7      MR. BURSTEIN:  Because the confidentiality

8   agreement is very limited.  The confidentiality agreement

9   says, "That the performer shall not directly or indirectly

10  disclose, divulge, render or offer any knowledge or

11  information to any other person or party concerning

12  matters relating to any program or Fox affairs and plans."

13      Now, unless they're using the word affairs in

14  the way that Roger Ailes had affairs, this does not relate

15  to their Fox's affairs.  That's one confidentiality

16  provision.  There is nothing in the record to suggest that

17  Ms. Tantaros or I breached that provision.  Then the other

18  one is, "Ms. Tantaros shall not issue any statements or

19  grant any interview concerning performances, services

20  hereunder."  No suggestion here that that was breached.

21  Those are the only confidentiality provisions in the

22  agreement.

23      So there is no breach of any confidentiality.

24  The only breach of confidentiality is their admitted

25  breach of trying to rebut legitimate statements that Ms.

- J L M -

PROCEEDINGS

1    Tantaros or I on her behalf, could make with divulging the

2    existence of the arbitration and the terms.

3              How much time do I have so I make sure --

4         THE COURT:  You have eight more minutes.

5         MR. BURSTEIN:  So let me move on.  If you want

6    to talk about sort of the general principle.  If you take

7    their argument to a logical end, let's say Bill Shine or

8    one of the other defendants could have raped Ms. Tantaros

9    in the Fox building and that would be subject to

10   arbitration because she was in the building.

11             THE COURT:  Wait, that's an intentional tort and

12   that's an assault, right?  That's an assault.  And there

13   is lots of case law cited in both your briefs that takes

14   assault out of the context of the typical arbitration

15   clause.

16        MR. BURSTEIN:  I'll give another one.

17        THE COURT:  Is there any assault alleged in this

18   case?

19        MR. BURSTEIN:  No.

20        THE COURT:  Any physical assault?

21        MR. BURSTEIN:  No physical.  She trips and falls

22   coming out of the elevator because they didn't

23   adequately -- they were negligent in some way.  She

24   wouldn't have tripped and fallen if she hadn't been an

25   employee on their theory.  That's arbitrable.  Now, here

- J L M -

26

PROCEEDINGS

1    is what the case law says, everybody cites and of course

2    Your Honor cites to the Tong case.  That's really the

3    major case here because it's 1st Department.  But nobody,

4    my adversaries haven't bothered to look at Justice Freed's [Fried]

5    underlying decision, what the Appellate Division affirmed.

6    And there they had an arbitration agreement, any dispute

7    arising out of this agreement will be subject to

8    arbitration.  But as Justice Freed [Fried] wrote, "Among the

9    conditions the agreement provides that Tong would not

10   disclose any of S.A.C.'s confidential information during

11   or after his employment."  This information was defined to

12   include any information relating to the business and

13   personal affairs of any of the principals.

14       Nobody seems to have paid attention to what was

15   actually being affirmed.  There was an affirmation of a

16   decision by Justice Freed [Fried] saying that the broad language

17   of the arbitration agreement applying to breaches of the

18   contract was covered.  But the arbitration agreement in

19   that case was radically -- I mean the underlying contract

20   was radically different.  So if you read Justice Freed's [Fried]

21   opinion, you will see something that is just quite

22   extraordinary and that makes all the difference in the

23   world.

24       The other cases they have cited, like Oldroyd

25   and Powers, they have a number of them, they are all

- J L M -

27

PROCEEDINGS

1  termination of employment cases.  This is a different kind

2  of case.  We also have the tortious interference claim

3  which is something different which is a tort claim, not a

4  contract claim.  It involves them going out and

5  interfering with the sale of her book.

6          THE COURT:  How is retaliation different than

7  termination?  Aren't those two sides of the same coin?

8          MR. BURSTEIN:  Except that all the cases that

9  they cite are termination clauses and all of those are

10  essentially breach of employment agreements as opposed to

11  here where there is no breach of contract claim.

12          Then, again, the other thing I want to say in my

13  last few minutes is, that if Your Honor is inclined --

14          THE COURT:  Speaking of that, five more minutes.

15          MR. BURSTEIN:  If Your Honor is inclined to send

16  us to arbitration, I would like the opportunity to amend

17  based upon new information.  I learned very recently, just

18  two nights ago, that another one of my clients, who shall

19  remain nameless, was subpoenaed.  And I was told by the

20  United States Attorney's office that there is an ongoing

21  criminal investigation of Fox relating to all of these

22  allegations, not just Ms. Tantaros, but all of the sexual

23  harassment allegations.  And I have a subpoena, it's

24  ongoing relating to another client, although I suspect

25  that Ms. Tantaros will be subpoenaed.  But here is the

- J L M -

PROCEEDINGS                                28

1    point, based upon my discussions with the prosecutors, and

2    they didn't tell me what exactly what it was, but once I

3    saw that it was the securities prosecutors I understood

4    immediately what was going on here, which is that what Fox

5    has done is enter into agreement, after agreement, after

6    agreement, with victims of sexual harassment, not reported

7    them in any of their SEC filings.  Because what they do,

8    as they offered Ms. Tantaros when they tried to settle the

9    case, they keep them as employees, per se, so nothing ever

10   gets reported.

11           Now, that's not what the U.S. Attorney says but

12   that's what I think is going on.  I now believe -- that

13   not -- that I'm not saying it's necessarily not subject to

14   arbitration, I believe I have a racketeering case here

15   based upon that and the extortions of my client.  There is

16   a very strong case law that suggests in this case you will

17   lose your job if you report sexual harassment, gives rise

18   to a pattern of racketeering activity which this Court can

19   look at, and then there are other claims.  I have

20   compelling evidence through confidential sources that Fox

21   was involved in electronic surveillance of my client on

22   her private communications in violation of 18 U.S.C. 2510,

23   which has a private right of action.  They have been --

24   just today The Times reported that they maintain fake news

25   sites and also what are known as sock puppet accounts,

                         - J L M -

PROCEEDINGS

1  fraudulent Twitter accounts.

2         THE COURT:  You made reference to that in your

3  papers and the complaint extensively.

4         MR. BURSTEIN:  Yes, but I have more information

5  about that.  I also have the fact that we allege that Fox

6  has subsequently, and this is important, post-employment,

7  has tortiously interfered with Ms. Tantaros' agreement

8  with her speaking agency, who represents numerous other

9  Fox talents and can only represent them with Fox's

10  permission.  That they have tortiously interfered with her

11  ability to get speaking engagements.

12         I think that all of this information is very

13  significant.  I only need two weeks to amend.  I think

14  that if I can allege -- Your Honor, just said it,

15  intentional torts don't fall within an arbitration clause.

16  I didn't bring a RICO case before because I didn't think

17  that I could establish a pattern of racketeering activity.

18  Now that I know that the U.S. Attorney's office is issuing

19  subpoenas and undergoing, according to the subpoena,

20  investigating alleged violations of federal criminal law

21  by Fox, and I figured out exactly what's going on, I can

22  make a RICO case.  I can make the argument that the

23  conduct by Mr. Shine and others was an extortion under the

24  Hobbs Act.

25         THE COURT:  Two minutes.

                    - J L M -

PROCEEDINGS

1    MR. BURSTEIN: I got in under the bell. Unless

2  Your Honor has any questions.

3    THE COURT: Not at this time.

4    Rebuttal.

5    MR. LEVANDER: Indeed, Your Honor.

6    May it please the Court, Mr. Burstein has gone

7  way outside the record. I would note that the courts have

8  held that RICO claims, if you could make one, which he

9  can't, would be arbitrable as well.

10    THE COURT: I didn't have any briefing on that

11  so I don't know the answer.

12    MR. LEVANDER: I'll represent that to you. And

13  the antitrust cases follow RICO cases. First of all, we

14  did address the question, he said it was not addressed, I

15  suggest you look at page 22 of our brief when you have a

16  chance, Your Honor. I would like to focus on Siroy and --

17    THE COURT: That's the reply brief you're

18  referring to, counsel?

19    MR. LEVANDER: Yes, exactly. So, it doesn't

20  say, as Mr. Burstein represented to Your Honor a moment

21  ago, that the confidentiality issue, even if you ignore

22  Contracts 101 and you ignore his outrageous behavior and

23  all of that is a breach of the arbitration agreement, it's

24  a breach of the agreement. So, therefore, it is a --

25    THE COURT: Wait. But it's in the arbitration

- J L M -

31

PROCEEDINGS

1    clause of the agreement.

2         MR. LEVANDER:  But it's an agreement of a

3    breach, breach of the agreement.  And the courts have said

4    over and over again, and I read to you the --

5         THE COURT:  The nuance you're claiming, it's a

6    breach of the agreement but not specifically a voiding of

7    the arbitration clause?

8         MR. LEVANDER:  Correct.  It also doesn't void

9    the arbitration clause.  Only thing that voids an

10   arbitration clause is if you are unconscionable in the way

11   that you created the arbitration clause.  Here, as I said,

12   cited to you both federal and state cases, any

13   post-contract conduct that you think is actionable is to

14   be arbitrated.  That is what the law is.

15         Indeed, Your Honor, Tong is right on point.  It

16   has nothing about harassment in it.  It's a harassment

17   case and the Court ordered, the 1st Department ordered the

18   arbitration to occur.  This is what you said about Tong in

19   your Siroy opinion.  First of all, you're talking about in

20   the Siroy case, it's a harassment, discrimination case and

21   you say, the language in Section 13, that's 13 of the

22   contract, specifically encompasses "all claims," just like

23   it does here, "arising out of or relating to the

24   employment agreement."  Exactly what we have here.

25   Nothing about harassment.

- J L M -

1       Plaintiff's claims of employment discrimination,

2  retaliation, clearly arise in and relate to her employment

3  and are thus governed by Section 13 and covered by her

4  employment agreement, citing Tong.  You describe Tong as

5  holding, "That since plaintiff's claims arose out of the

6  events that occurred in the course of his employment by

7  defendant and supervisor, the supervisors of the

8  defendant, they were deemed subject to the employment

9  agreement which covered any dispute or controversy arising

10  out of or relating to the agreement."  It's exactly the

11  analysis here.  All of her claims arise out of and are

12  related to.

13       THE COURT:  What about the tortious interference

14  claim?

15       MR. LEVANDER:  He conceded that's subject to

16  arbitration in his earlier papers.  And tortious

17  interference is a tortious interference with the contract.

18  So it relates to the contract.  It's clear that everything

19  is encompassed by the --

20       THE COURT:  And it relates to particularly the

21  book provision within the contract, right?

22       MR. LEVANDER:  Right.  We are enforcing the book

23  provision and he's saying that enforcement of our

24  contractual right, which is the subject of the arbitration

25  clause, is a tortious interference with the other

                        - J L M -

PROCEEDINGS

1    contract.

2         THE COURT:  Did you say earlier that your

3    arbitration, your arbitration claim only relates to the

4    book and not to the alleged harassment and retaliation

5    claims?

6         MR. LEVANDER:  When we first brought the

7    arbitration claims that's exactly what it related to.

8    When this goes forward, I hope in arbitration, it will be

9    expanded, no doubt, to encompass some other things.  I

10   suggest, Your Honor, Mr. Burstein said that he waffled on

11   whether or not his client violated the contract.  But in

12   Exhibit H --

13        THE COURT:  He didn't waffle, he said that she

14   didn't, but really avoided explaining how in a way that

15   was persuasive.  I might give him a chance, last chance on

16   that since you raised it.

17        MR. LEVANDER:  But Exhibit H to my reply

18   affidavit attaches Mr. Burstein's comments to the press

19   which said that she knows that she's taking a risk in

20   violating her contract's confidentiality clause in making

21   these statements.  There is no question that she violated

22   it and they knew that she was violating it when she got

23   involved.

24        Also, the confidentiality agreement that was

25   gone over by Mr. Burstein when he read it covers not only

- J L M -

PROCEEDINGS

34

1  arbitration but "All relevant allegations and events

2  leading up to the arbitration." So it's broader than what

3  he just said, it encompasses her claims, period.

4          Finally, I would note that Mr. Burstein has

5  tried to inject into here all kinds of extraneous stuff

6  that is not in the record. The fact that he has a male

7  client that may have received a subpoena. Fox has not

8  received a subpoena. Fox would clearly cooperate if there

9  were a subpoena. But that he is trying to somehow make

10  this case not about the arbitration clause, which it is,

11  but to bring in something that has to do with another one

12  of his clients, not this client and not a sexual

13  harassment claim, is beyond the pale.

14          THE COURT: Time. I'm going to address Mr.

15  Burstein one more time because --

16          MR. BURSTEIN: Could I have two minutes?

17          THE COURT: Two minutes. But I specifically

18  want you to address the issue of the breach by your

19  client.

20          MR. BURSTEIN: Sure. I want to make one thing

21  clear, I never said it was a male client, that was Mr.

22  Levander.

23          THE COURT: No, you didn't.

24          MR. BURSTEIN: I never said it was a male client

25  and I want that to be on record.

                    - J L M -

35

PROCEEDINGS

1        Second of all, I would ask Your Honor, although

2    neither party did it because I think that there were

3    concerns about confidentiality, I think that both parties,

4    for Your Honor to have a full record, should see the

5    entire employment agreement because it really addresses --

6        THE COURT:  Then you could have provided it to

7    me at the time that you submitted the papers or asked for

8    it to be submitted in camera and you haven't done that.

9        MR. BURSTEIN:  But they haven't --

10        THE COURT:  So explain to me how your client's

11    breach is not a breach.

12        MR. BURSTEIN:  My client's breach is not a

13    breach because there is nothing that the other side has

14    shown which makes clear, and if I could have a moment let

15    me just look at what the exhibit that they have.

16        (Pause)

17        MR. BURSTEIN:  Well, one of the problems, and

18    maybe this is -- they don't put the full agreement in, so

19    they only give you part of the agreement, they leave out

20    the other part about confidentiality.

21        THE COURT:  You did the same.

22        MR. BURSTEIN:  I understand.  But the point

23    would be, you have nothing before you to show that she

24    violated confidentiality.  They haven't submitted any

25    document.  They have statements by me, but they haven't

- J L M -

PROCEEDINGS                                    36

1    provided the provisions of the agreement that talk about

2    confidentiality.  So they say it's a breach but there is

3    nothing in their papers, that as far as I can tell,

4    actually identified what would be a breach of

5    confidentiality.

6             THE COURT:  Okay.  Can we take a five minute

7    break at this time and then we'll go back on the record.

8             (Short recess taken)

9             THE COURT:  On the record.  First, I would like

10   to commend counsel on extremely well-prepared,

11   well-organized and capable argument made on the record

12   today, as well as in the papers on the briefing of this

13   case.

14            At this point in time I'm going to render my

15   decision on the record.  Plaintiff's employment at Fox was

16   covered by an employment agreement that contained a valid,

17   broad and unambiguous arbitration provision requiring that

18   any controversy, claim or dispute arising out of or

19   relating to this agreement or your employment shall be

20   brought before a mutually selected three member

21   arbitration panel.  Ample case laws in both New York State

22   and the Federal Courts has held that all the claims and

23   controversies sought to be litigated by plaintiff fall

24   within the terms of the parties broad arbitration

25   provision.  Including her claims under the New York State

- J L M -

PROCEEDINGS

37

1    Human Rights Law and New York City Human Rights Law for

2    harassment and retaliation, as well as her claims for

3    tortious interference, since those claims arose within the

4    scope of plaintiff's employment and clearly fall within

5    that scope.

6         All of the individual defendants, though they

7    are not signatories to the arbitration agreement, can

8    invoke the arbitration clause and compel arbitration.

9    This would apply even if the claims against them were

10   severed from the claims against Fox.  The misconduct

11   alleged by plaintiff relates to these individual's

12   behavior as officers, directors and employees or agents of

13   Fox, and they necessarily relate to their alleged conduct

14   as agents of Fox News.  Further, a careful review of the

15   claims against the individual defendants shows that these

16   claims are factually intertwined with the agreement and

17   the claims against Fox News.  The claims against the

18   individual defendants involve the very same issues and

19   circumstances.  This principle applies equally to the

20   employment claims and the tortious interference claims at

21   issue in this case.  Allowing such claims to proceed in

22   court would be contrary to established public policy

23   strongly favoring arbitration of such disputes.

24        Plaintiff's claim that the defendants waived

25   arbitration by materially breaching the arbitration clause

- J L M -

PROCEEDINGS                                              38

1   is unsupported by any pertinent case law.  That claim is

2   without merit as the defendants have not engaged in

3   protracted litigation that prejudiced the plaintiff.  In

4   any event, it was plaintiff who first involved the news

5   media in this dispute in violation of the confidentiality

6   provisions of the parties' agreement.  Any remaining

7   claims by ~~defendant~~ plaintiff to bring this case outside the scope

8   of arbitration have been considered by the Court and have

9   been found to be without merit.

10          Plaintiff's oral application made for the first

11  time on argument to amend the pleadings is denied.  That

12  denial is without prejudice.  Defendants' motion to compel

13  arbitration of all of plaintiff's claims against all of

14  the defendants pursuant to CPLR 7503 are granted.  Thank

15  you.  Pursuant to law, this action is stayed pending its

16  outcome of the arbitration.

17          You can order the transcript, counsel, submit it

18  to me to be so ordered.  Then, counsel, you'll have the

19  opportunity to file your notices of appeal.

20          MR. BURSTEIN:  Thank you, Your Honor.

21          THE COURT:  Thank you, counsel.

22  CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT.

23

24          -------------------------------

25  SO ORDERED            JACK L. MORELLI, CM, CSR

                          J L M -

    DAVID B. COHEN, J.S.C.

    3-9-2017