UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ANDREA TANTAROS,

                            *Plaintiff,*

        -- against --                                    Case No. 17-cv-2958

FOX NEWS NETWORK, LLC, WILLIAM
SHINE, IRENA BRIGANTI, PETER A.
SNYDER, DISRUPTOR, INC., and JOHN
DOES 1-50,

                            *Defendants.*
------------------------------------------------------------------X


**AMENDED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**


JUDD BURSTEIN, P.C.
5 Columbus Circle, Suite 1501
New York, New York 10019
(212) 974-2400
(212) 974-2944 (Fax)
*Attorneys for Plaintiff Andrea Tantaros*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      A.     THE DANIEL WAYNE BLOCK DECLARATION . . . . . . . . . . . . . . . . . . . . . .  5

      B.     THE FNC DEFENDANTS' REMAINING FACTUAL CLAIMS . . . . . . . . . . .  14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

POINT I

THE GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

POINT II

THE COMPLAINT'S CLAIMS FOR RELIEF ARE WELL PLED . . . . . . . . . . . . . . . . . . .  16

      A.     THE ILLEGAL ELECTRONIC SURVEILLANCE CLAIM . . . . . . . . . . . . . . .  18

      B.     THE COMPUTER HACKING CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

      C.     THE INTENTIONAL INFLICTION OF EMOTIONAL
             DISTRESS CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

POINT III

SANCTIONS ARE NOT WARRANTED BASED UPON MS. TANTAROS
FILING HER COMPLAINT AS OPPOSED TO PURSUING HER
CLAIMS IN AN ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

POINT IV

SANCTIONS MAY NOT BE AWARDED UNDER RULE 11(b)(1) . . . . . . . . . . . . . . . . . . .  25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

i

## **TABLE OF AUTHORITIES**

<u>CASES</u>

*Am. Fun & Toy Creators, Inc. v. Gemmy Indus., Inc.*,
    1997 WL 482518 (S.D.N.Y. Aug. 21, 1997) (Francis, M.J.) ..................... 16

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ............................................. 19-20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................. 4-5, 16-17

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
    2003 WL 21355212 (S.D.N.Y. June 11, 2003) (McKenna, D.J.) ................... 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................... 16-17

*Dennis v. Napoli*,
    148 A.D.3d 446 (1st Dep't 2017) ......................................... 23

*E. Gluck Corporation v. Rothenhaus*,
    252 F.R.D. 175 (S.D.N.Y. 2008) (Marrero, D.J.) ............................. 4

*Eastway Const. Corp. v. City of N.Y.*,
    762 F.2d 243 (2d Cir. 1985) ............................................. 16

*Edberg v. Neogen Corp.*,
    17 F. Supp.2d 104 (D. Conn. 1998) ........................................ 3

*Kramer v. Pollock-Krasner Foundation*,
    890 F. Supp. 250 (S.D.N.Y. 1995) (Baer, D.J.) ............................. 16

*Safe-Strap Company, Inc., v. Koala Corporation*,
    270 F.Supp.2d 407 (S.D.N.Y. 2003) ..................................... 4, 16

*Sewell v. Bernardin*,
    795 F.3d 337 (2d Cir. 2015) ........................................... 21-23

*Sussman v. Bank of Israel*,
    56 F.3d 450, 459 (2d Cir. 1995) ......................................... 25

*Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc.*,
   2014 WL 4899745 (S.D.N.Y. Sept. 30, 2014) (Swain, D.J.) . . . . . . . . . . . . . . . . . . . 15-16

STATUTES AND OTHER AUTHORITY

Fed R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17, 19

Fed.R.Civ.P. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed.R.Civ.P. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

Fed.R.Civ.P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed.R.Civ.P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17

Plaintiff Andrea Tantaros ("Ms. Tantaros") and her counsel, Judd Burstein, P.C., submit this Memorandum of Law in opposition to the entirely frivolous motion for sanctions filed by Defendants Fox News Network, LLC ("FNC"), William Shine ("Shine"),[1] Dianne Brandi ("Brandi"), and Irena Briganti ("Briganti") (collectively, the "FNC Defendants").

## INTRODUCTION

> **During our assessment of the laptop of Ms. Andrea Tantaros, Cycura observed the following technical and procedural irregularities, which, in our opinion as forensic and security experts are alarming** ….

That is the conclusion (discussed below, at pages 21-22) of one of the world's foremost forensic analysis firms. So much for FNC insisting that Ms. Tantaros's claims are frivolous.

Over the past year of scandals and arrogance, FNC has managed to eliminate the boundaries between (a) unlikely or outlandish, and (b) "likely happened." But just when one might have thought that we were approaching the far shore of the possible, FNC yet again expanded its borders.

This case started off as a case about illegal electronic surveillance and the use of "sockpuppet" social media accounts – extremely disturbing allegations if true (which they are). But now, as we demonstrate infra *at* POINT I(A), **it seems highly likely that someone working for FNC has extorted or bribed Daniel Wayne Block into signing a Declaration that cannot possibly be true**. As outlandish as this claim seems, there really is no other rational explanation for the Declaration he has signed. We do not suggest that counsel for FNC did the deed or even approved of it. But signs of coercion or bribery are so obvious that the best that can be said for them is they willfully blinded themselves to the obvious. They too should be held responsible.

---

[1]   It is not clear whether Shine is seeking sanctions because he has discharged counsel for the other moving defendants. (*See* Dkt. No. 30)

The FNC Defendants' motion for sanctions is just another iteration of FNC's standard playbook: (a) allow rampant sexual harassment, (b) intimidate women into remaining silent, and (c) when a woman refuses to back down, try to destroy her or at least scare her into submission.

The case of Gretchen Carlson ("Carlson") provides an archetypal example of FNC's *modus operandi*. In July of 2016, Carlson, a former FNC host, sued FNC claiming that she had been sexually harassed by Roger Ailes ("Ailes")[2], then-President of FNC. (Exhibit A to the June 28, 2017 Declaration of Judd Burstein ("Burstein Dec.")) Some two months later, FNC settled with Carlson, paying her $20 million, and **apologizing to her**. (Exhibit B to the Burstein Dec.) But the relevance of the Carlson settlement lies with what happened in between Carlson's suing and her settlement with FNC. **First**, FNC falsely denied Carlson's allegations even though they were true, instead claiming that she had made up a story because her contract was not being renewed. (Exhibit A to the Burstein Dec.) **Second**, even though FNC knew that Carlson was telling the truth, it hired Bo Dietl ("Dietl"), a private investigator, to have his investigators follow Carlson and also try to find negative information about her. (Exhibit C to the Burstein Dec.) **Third, the settlement and the apology came only after FNC learned that Carlson had tapes of Ailes harassing her.** (Exhibit D to the Burstein Dec.)[3]

The difference between Ms. Tantaros and Carlson is that, regrettably, Ms. Tantaros does not have tapes of the harassment she suffered. But her story is essentially the same. She was sexually harassed by Ailes, Bill O'Reilly ("O'Reilly"), and others. She was told to remain silent, but she refused to do so. FNC then removed her from the air to make clear to her that she would

---

[2]   Plaintiff had originally named Ailes as a defendant in this action. However, due to Ailes's recent death, Plaintiff has dismissed her claims against him without prejudice to avoid the delays in this case that would be occasioned by waiting for the substitution of Ailes's Estate as a defendant.

[3]   We recognize that the allegations above are based upon media reports, but we have no doubt that the accounts are truthful, and we challenge the FNC Defendants to dispute them.

suffer if she did not back down.  She still refused to do so.  (Complaint, Exhibit E to the Burstein Dec." at ¶ 6)  When that did not work, FNC hired Dietl, a private investigator to find some leverage over her, stooping so low as to try to "persuade the ghostwriter of Ms. Tantaros's book to provide compromising information about her."[4]

Subsequently, as detailed in the Complaint and the Tantaros Dec., Ms. Tantaros's refusal to back down led to the events at issue in this case: (a) the hacking of her personal computer to gain access to her Gmail account, (b) illegal electronic surveillance of her private phone calls, and (c) a cruel social media campaign against her using sockpuppet accounts (described below), which included Tweets from sockpuppet accounts designed to let her know she was the subject of illegal electronic surveillance.  The digital assault upon Ms. Tantaros is completely in character for FNC, which has been using sockpuppet social media accounts for years. (Complaint, at ¶ 7; Exhibit F to the Burstein Dec.)  Moreover, in 2009, an FNC affiliate, News America Marketing, paid $29.5 million to settle a lawsuit in which one of its competitors alleged that News America Marketing had hacked its computers to steal proprietary information. (Exhibit G to Burstein Dec.)

Yet again, Ms. Tantaros refused to back down.  So, after she commenced this action, counsel for the FNC Defendants found a new intimidation tactic: threatening and then filing a sanctions motion which no competent, ethical lawyer could ever file in good faith.  As we demonstrate in this Memorandum of Law, the FNC Defendants' dishonest and disgraceful motion for sanctions should be condemned because "Rule 11 should never be used as a litigation tactic for intimidating opposing counsel from asserting a meritorious position."  *Edberg v. Neogen Corp.*, 17 F. Supp.2d 104, 109 (D. Conn. 1998).  Moreover, opposing counsel's abuse of

---

[4]     **To be clear, as stated in Ms. Tantaros's Declaration, she did not employ a ghostwriter for her book.** (June 28, 2017 Declaration of Andrea Tantaros ("Tantaros Dec.") at ¶ 6)

the sanctions process is even more outrageous because it "raises issues that more properly should be addressed in a Rule 12(b)(6) motion to dismiss." *E. Gluck Corporation v. Rothenhaus*, 252 F.R.D. 175, 183 (S.D.N.Y. 2008) (Marrero, D.J.) **As such, the motion "is not only premature but entails a misuse of Rule 11…. [U]nder these circumstances [the] Rule 11 motion teeters as close as it can approach, without crossing over, to the borderline of being sanctionable itself."** *Id.* (Emphasis supplied)

Here, counsel for the FNC Defendants went far beyond that borderline by seeking sanctions based primarily upon the April 26, 2017 Declaration of Daniel Wayne Block ("Mr. Block") ("Block Dec.") before Ms. Tantaros has been granted an opportunity to depose Mr. Block or seek discovery from the FNC Defendants. The notion that sanctions should be imposed based upon the submission of an untested Declaration is absurd given that doing so would deprive Ms. Tantaros of the discovery that would be available to her prior to a summary judgment motion. As Judge Knapp held in *Safe-Strap Company, Inc., v. Koala Corporation*, 270 F.Supp.2d 407, 416 (S.D.N.Y. 2003): "The Advisory Committee Notes for Rule 11 explain that 'Rule 11 motions…should not be employed…to test the sufficiency or efficacy of allegations in the pleadings; *other motions are available for those purposes….*' **[A] Rule 11 motion for sanctions is not a proper substitute for a motion for summary judgment."** (Italic emphasis in original; bold emphasis supplied).

## STATEMENT OF THE FACTS

The facts relevant to a determination of this motion are set forth in the accompanying Burstein Dec. and Tantaros Dec., and are incorporated by reference herein. In addition, the factual allegations in the Complaint must also be considered on this motion because, at this stage in the proceedings, they must be "accepted as true" by the Court. *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).   In this Statement of Facts, we summarize the reasons why the "evidence" upon which the FNC Defendants rely in their improper effort to evade motion practice under Rule 12(b)(6) and Rule 56 are the product of extortion, bribery, or a failure by opposing counsel to carefully read, analyze and test the veracity of what they were submitting.

## A.   THE DANIEL WAYNE BLOCK DECLARATION

Because it is so shocking, and because it lies at the heart of the FNC Defendants' sanctions motion, we first address the demonstrably false Block Dec. (Exhibit 1 to the May 24, 2017 Declaration of Benjamin M. Rose in Support of the FNC Defendants' Motion for Sanctions ("Rose Dec.")).

In the first instance, it is important to emphasize that the Complaint specifically alleges that Mr. Block is a real person whose Twitter account has been used as a vehicle to abuse Ms. Tantaros by letting her know that she was the subject of illegal electronic surveillance.  After first noting that there are different kinds of "sockpuppet" social media accounts (Complaint, annexed as Exhibit E to the Burstein Dec., at ¶ 38), Ms. Tantaros goes on to allege that "[f]or purposes of this Complaint, we are specifically referring to sockpuppet accounts operated by a paid commercial entity to disseminate client material, or a real person who is paid to Tweet particular messages in much the same way…." (*Id.*, at ¶ 39)  The Complaint then alleges:

> On May 21, 2016, a Tweet from Block's Twitter account was sent to @AndreaTantaros, stating: "Dear Andrea-I just recently bought one of your HC copies of 'Tied Up in Knots' & mailed a bookplate to you to sign, pls confirm[.]" A few days later, a copy of Ms. Tantaros's book showed up in the mail.

> According to his LinkedIn page, Block is a retired "Transportation Manager" living in Gainesville, Florida. … There is no possible way that he could have known Ms. Tantaros's home address. Nonetheless, Ms. Tantaros[] received a copy of her book in the mail a few days later. As a result, and as Defendants knew would be the case, Ms. Tantaros became concerned for her physical safety, and started keeping tabs on the Block Twitter account.

(*Id.*, at ¶¶ 47-48)

These allegations make it crystal clear that Ms. Tantaros is alleging that the Block Twitter Account falls in to the second category of sockpuppet accounts described in the Complaint: "a real person who is paid to Tweet particular messages…." (*Id.*, at ¶ 39)[5]

Thus, **the issue in this case is not, and has never been, whether Mr. Block exists; it is whether his Twitter Account was used by the FNC Defendants to victimize Ms. Tantaros**. The Block Dec. fully, albeit inadvertently, establishes that this is what transpired. Moreover, it also shows that he must have been threatened or bribed[6] into signing the Block Dec. because it is demonstrably false in so many important respects and otherwise ludicrous. As noted, we do not believe that counsel for the FNC Defendants knew what their clients were doing. But that did not excuse counsel's failure to look past their slavish devotion to their deep-pocket, corporate clients and analyze the substance of what they were submitting. Had they done so, they would have recognized that it is impossible to square the Block Dec. with both common sense and, more importantly, indisputable documentary proof:

**First**, our concerns about extortion/bribery arise in part from the fact that **it is hard to believe that a father would seek to use the suicide of his own son to explain away the unexplainable. Yet, that is what the Block Dec. seeks to accomplish.** As alleged in Paragraph 8(b) the Complaint:

---

[5]     As explained in the Tantaros Dec., at ¶ 10, Ms. Tantaros did not intend to allege that Mr. Block was necessarily receiving directions from the FNC Defendants, solely or directly. Rather, she claims that Mr. Block is a real person whose Twitter account was used by a third party – perhaps innocently but likely for compensation – to harass Ms. Tantaros. The Burstein Dec., at ¶¶ 50-52, and its attached exhibits, further explains the other ways in which the @DanielWayneBlo1 account could have been manipulated by the FNC Defendants.

[6]     Mr. Block is an easy target of bribery because his house in currently in foreclosure. (Exhibit TT to Burstein Dec.) As further explained in the Burstein Dec., at ¶ 50, he did not name Mr. Block as a Defendant in this action because he believed that Mr. Block was a person with financial troubles who was likely trying to earn money through permitting third party access to his Twitter account.

On June 19, 2016, the day after Ms. Tantaros and her mother had spoken on the telephone about plans for the **third anniversary** of the August 20, 2013 death of Ms. Tantaros's brother, Daniel, [the Block Twitter Account] tweeted: "**PURPLE MEMORIAL ... FOR DANIEL TANTAROS, R.I.P. DANIEL....**" ... **There is no explanation for a tweet about the death of Ms. Tantaros's brother <u>almost three years after-the-fact and two months before the anniversary of his death</u> other than that it was designed to upset Ms. Tantaros both about the death of her brother and the fact that she was being surveilled[.]**

(Emphasis in original)

While Mr. Block's explanation for this "coincidence" is laughable on its face, it is also deeply upsetting in how cynical it is:

Regarding a tweet, sent in mid-June 2016 to Andrea Tantaros, that depicted a woman standing in a field of purple flowers below text reading "Purple Memorial... for Daniel Tantaros, R.I.P. Daniel...," I recall sending the tweet after I learned, though my internet research, that Andrea Tantaros had lost her brother, Daniel, who shared his name with my son Daniel who had taken his own life in November 2014. I sent the tweet instead of sending a condolence card to Andrea Tantaros. I found the image on the internet and copied it to my tweet. I composed the text myself.

(Block Dec. at ¶ 8(b))

**Mr. Block's claim that he "sent the tweet instead of sending a condolence card" is demonstrably false because the Tweet in question (Exhibit C to the Complaint) was not addressed to "@andreatantaros."** As shown by Exhibit H to the Burstein Dec., adding the "@andreatantaros" address to the Tweet would have been the only way to ensure that it would reach Ms. Tantaros. Since the Tweet in question was not addressed to @andreatantaros, it is therefore ridiculous to credit Mr. Block's claim that he posted the Tweet in lieu of "sending a condolence card" because there would have been no reason for Mr. Block to have assumed that Ms. Tantaros would have even seen the Tweet. **We find it almost impossible to believe that a man who loved his son would willingly dishonor his memory with such a palpable lie.**

**Second**, there is the speed with which the Block Dec. was secured, and the way it was presented. The Complaint was filed on April 24, 2017, and the Block Dec. was executed just two days later, on April 26, 2017. This short time gap suggests that Mr. Block was put under incredible time pressure to sign the Block Dec. Moreover, it was most likely secured by a private investigator, such as Dietl, or some other FNC operative, because (a) it is clear from the font in which it was typed that the Block Dec. was not provided to Mr. Block by opposing counsel, and (b) the Block Dec. contains wholly superfluous denials of involvement in conduct in which the Complaint does not allege Block participated (Block Dec. at ¶¶ 6 (first sentence), 12 and 13). Moreover, the Block Dec. was not notarized by an attorney or by someone working in a law office. Rather, **it was notarized by a woman who sells mail-order chestnuts out of her UPS Store in Newberry, Florida**. (Burstein Dec. at ¶ 12; Exhibit I thereto)

**Third**, no rational person would willingly or knowingly make the claims found in the key second and third paragraphs of the Block Dec.:

> I have been an active user of the internet and of social media applications. Within the past five years, I have maintained and used two (2) Twitter accounts: "@DanielWayneBlo1" and "@Danie1Block5." The latter account, "@Danie1Block5," was a joint account I shared with my late son, Daniel Block. It is no longer in use. The former account, "@DanielWayneBlo1," is my own personal account I created that account for my own personal use, not as a "sock puppet" for anyone else. I have never shared the logon information to that account with anyone, nor to my knowledge does anyone (other than me) possess the logon credentials for that account. I have never authorized anyone to use that account on my behalf.

> All Twitter messages ("tweets") sent from the "@DanielWayneBlo1" account were sent by me. I sent tweets when I was moved to do so, either by what I have heard in the course of the day or by things that remind me of my family or acquaintances. No one has ever asked me to send any tweet on their behalf, nor has anyone ever paid me to send any tweet on any Twitter account.

(Block Dec. at ¶¶ 2-3)

These two crucial paragraphs in the Block Dec. demonstrate either that Mr. Block is deranged or, as we believe, has been extorted or bribed into submitting a false Declaration:

a.       Mr. Block's claim that "'@DanielBlock5,' was a joint account I shared with my late son, Daniel Block [which] is **no longer in use**" (emphasis supplied) is false because, as shown by Exhibit J to the Burstein Dec., **the @DanielBlock5 account has been in use throughout 2017, including up to June 27, 2017**.

b.       In contrast, as shown by Exhibit K to the Burstein Dec., the last Tweet sent from the Block Twitter Account (@DanielWayneBlo1) was on **July 27, 2016**.  Plainly, **Mr. Block has no idea what is being done with these two accounts if he erroneously believes the @DanielBlock5 account is dormant (it is in fact active) and the @DanielWayneBlo1 account is still active (it is in fact dormant)**.

c.       It is also untrue that the @DanielBlock5 account was a joint account that Mr. Block shared with his son.  Mr. Block's son, Daniel, died on November 26, 2014.  (Exhibit L to Burstein Dec.)  Yet between the creation of the account in April of 2012 (Exhibit M to Burstein Dec.), and the day his son died, there was just one April 30, 2012 Tweet from the account stating, perhaps accurately: **"Had my I.D. compromised…."** (Exhibit N to Burstein Dec.) (Emphasis supplied).  **Indeed, the account did not become active after that first 2012 Tweet until June 16, 2016 – the same time that the harassment of Ms. Tantaros was in high gear**. (Exhibit O to Burstein Dec.)

d.       Moreover, if @DanielBlock5 was a joint account which Mr. Block shared with his son, why did he wait until March of 2016 – at the very time that Ms. Tantaros was pushing Shine, Brandi and Denise Collins (then-head of Human Resources for FNC) for relief from

9

sexual harassment and retaliation (Complaint at ¶¶ 23-24) – to create the @DanielWayneBlo1 account? (Exhibit P to Burstein Dec.)

e.   The fact that the @DanielBlock5 account is operating while the @DanielWayneBlo1 account has been dormant for nine months also devastates Mr. Block's claim that he sent 100% of Tweets "from the "@DanielWayneBlo1" account … when [he] was moved to do so, either by what [he has] heard in the course of the day or by things that remind [him] of [his] family or acquaintances."   (Block Dec. ¶ 3)  How, then, can one explain that similar or **identical Tweets were sent from both accounts on the same day or within days of each other?** (*Compare*, *e.g.*, Exhibit Q with Exhibit R to Burstein Dec.; Exhibit S with Exhibit T to Burstein Dec.; Exhibit U with Exhibit V to Burstein Dec.)[7]  If Mr. Block was under the impression that the @DanielBlock5 account was no longer active following his son's death, then someone else must have sent Tweets from that account.   It would therefore have to be a coincidence of Biblical proportion for Tweets supposedly personally posted by Mr. Block on the @DanielWayneBlo1 because he was "moved to do so" were also sent out from the @DanielBlock5 account, which Mr. Block claims to believe was dormant.  Moreover, **the Block Dec. does not claim that he is responsible for the Tweets posted on the @DanielBlock5 account**.

**Fourth,** the fact that the @DanielBlock5 account was created in 2012 and suddenly became active in June of 2016 after four years of inactivity strongly suggests that it was, along with the @DanielWayneBlo1 account, a sockpuppet account.  In a recent article about the millions of sockpuppet accounts used to bolster Donald Trump's campaign, it was noted that

---

[7]      An academic study by researchers from Stanford University and the University of Maryland has concluded that "pairs of sockpuppets controlled by the same individual are more likely to interact on the same discussion at the same time than pairs of ordinary users."  (Exhibit CC to the Burstein Dec., at 1)  That description applies to the interrelation between the @DanielWayneBlo1 and the @DanielBlock5 accounts, as well as the way the @DanielWayneBlo1 and @realNASCARman accounts suddenly interacted on May 21, 2016.

"most Twitter sockpuppet accounts were created between 2010 and 2012…, but either sat dormant for years, or deleted all their previous tweets before a flurry of activity when the propaganda campaign was launched in March 2016." (Exhibit X to Burstein Dec., at 5)

**Fifth**, Mr. Block is not remotely "an active user of the internet and of social media applications." His Facebook page shows that the date of his last public post on his timeline was July 15, 2012. (Exhibit Y to Burstein Dec.) While he does have a LinkedIn account, that account raises more questions than answers because it was created only in July of 2016 (*i.e.*, a few months after the @DanielWayneBlo1 account was created), there has been a total of just three posts since then. (Exhibit Z to Burstein Dec.) Moreover, it makes no sense for a retired transportation worker to suddenly open a LinkedIn account because LinkedIn is a networking social media site for people engaged in some sort of business or seeking employment

**Sixth, the Daniel Wayne Block Facebook page is particularly significant because it contains none of the images – bunnies, lions, Disney characters – which the Block Dec. claims are so important to Mr. Block.** (Exhibit Y to Burstein Dec.)

**Seventh**, Mr. Block states: "I am not familiar with the Twitter account in the name of 'ANDREA TANTAROS FAN' or with the Twitter handle '@realNASCARman.'" (Block Dec. at ¶ 11) This is an important claim because the Complaint alleges that this Twitter account was "the social media version of a 'sleeper cell,'" which suddenly awoke when a key message from the Block Twitter Account was sent to her on May 21, 2016. (Complaint at ¶¶ 46-53) Yet, as shown by Exhibit AA to the Burstein Dec., **there were direct communications between the @DanielWayneBlo1 and @realNASCARman accounts at least twice**: (a) the key May 21, 2016 Tweet sent to Ms. Tantaros about her book was also sent directly from the Block Twitter Account to @realNASCARman, and (b) there was another Tweet sent from the Block Twitter

Account to @realNASCARman on June 19, 2016.  **Incredibly, Exhibit 18 to the Rose Dec.**

**confirms the lie in the Block Dec. because it contains the May 21, 2016 Tweet from the**

**@DanielWayneBlo1 account sent directly to @realNASCARman.**

**Eighth**, in early June of 2016, when Ms. Tantaros was speaking regularly on her personal

telephone about the hospitalization of a friend due to a poisonous scorpion bite, the

@DanielWayneBlo1 account sent a Tweet with an Amazon.com advertisement for a DVD of a

**1957** movie entitled "The Black Scorpion…," which had been available on Amazon since

2014…." (Complaint at ¶ 8(a))  The Block Dec. seeks to explain this "coincidence" as follows:

> Regarding a tweet sent in early June 2016 that depicted the DVD cover of a film
> titled "The Black Scorpion," I recall sending the tweet with my brother in mind.
> My brother, Duane, lives in Syracuse, New York and is a fan of classic science
> fiction films. When I come across things that remind me of him, like the "Black
> Scorpion" DVD cover, I tweet them.

(Block Dec. at ¶ 8(a))  However, our research indicates **Mr. Block's brother, Duane, does not**

**have a Twitter account** (Burstein Dec., at ¶ 48; Exhibit BB thereto) so there would be no reason

for Mr. Block to tweet something intended for his brother.  Moreover, none of the science fiction

Tweets annexed to the Rose Dec. indicate that they were addressed to any Twitter account.

**Ninth**, the Block Dec. proves perhaps the most seemingly outlandish allegation in the

Complaint: that, in the days prior to the filing of the Complaint, a key Tweet showing that Mr.

Block sent the key May 21, 2016 Tweet to Ms. Tantaros at @andreatantaros disappeared from

his Twitter feed (Complaint at ¶ 49)[8]  The Block Dec., however, states that he did in fact send

that Tweet to Ms. Tantaros.  (Block Dec. at ¶ 8(e)).  Hence, if he did send it, someone else must

have removed it from his Twitter Account.  To be clear, though, we believe that this portion of

the Block Dec. is an inadvertent admission arising from the fact that someone who did not pay

---

[8]      In the Burstein Dec., at ¶ 49, Mr. Burstein states that he saw the Tweet in question on Mr. Block's time-line on April 15 or 16, 2017, but did not print it out at that time.  When he then went back to find it to print it out, it had disappeared.

careful attention to the details of the Complaint drafted the Declaration and convinced Mr. Block, either through bribery or extortion, to sign it.

**Tenth**, the notion that Mr. Block has only sent Tweets from the @DanielWayneBlo1 account "when [he] was moved to do so, either by what [he has] heard in the course of the day or by things that remind [him] of [his] family or acquaintances" (Block Dec. ¶ 3) is ludicrous considering Exhibit DD to the Burstein Dec., which provides all the Tweets of Amazon.com advertisements for movies sent from that account.   If this is true, then Mr. Block wins the award for the most eclectic tastes of any 71-year-old man in America.  Is it credible that the same man who is so interested in books and DVDs about war and the old West is also such a devoted aficionado of Barbara Streisand's Yentl and virtually every Doris Day movie ever made? Significantly, the @DanielBlock5 account is also littered with Amazon.com ads.  (Exhibit EE to Burstein Dec.)

**Eleventh**, if one examines the times of the Tweets from the @DanielWayneBlo1 account, it is clear that he is not sending out the Tweets from that account because so many of them are sent between Midnight and 6:00 a.m.  (*See, e.g.*, Rose Dec. Exhibit 9 at 2; Exhibit 10 at 1, 8, 22-25 28 and 30; Exhibit 11 at 3-8; and Exhibit 12 at 9-10)  While it is true that a person can schedule Tweets to be sent at a later time, the Tweets posted on the @DanielWayneBlo1 account are hardly the types of Tweets that would be scheduled to be sent in the middle of the night.

As for the rest of the claims made in the Block Dec., (a) it fails to take account of Paragraph 64 of the Complaint which specifically alleged that there were additional Tweets from the @DanielWayneBlo1 account that were not described in the Complaint, (b) they are facially

incredible, and (c) at most, they create a factual dispute that cannot be resolved without discovery.

**B.**     **THE FNC DEFENDANTS' REMAINING FACTUAL CLAIMS**

The remaining "facts" offered by the FNC Defendants fare no better:

**1.**     **Similar or Identical Tweets**

Exhibits 9 to 16 to the Rose Dec. point to instances in which there were similar or identical images that were posted at times on the @DanielWayneBlo1 account other than the times mentioned in the Complaint.   This attempt to undermine the credibility of the Complaint's allegations (**something which is inappropriate at this stage**) fails for a host of reasons.

**First**, and foremost, many of the images included in these exhibits were also posted on the @DanielBlock5 account which, according to Mr. Block, was dormant prior to 2016.  Indeed, Mr. Block does not contend that he posted anything on the @DanielBlock5 account in 2016.  **So how is it that, at or around the same time that the Tweets annexed to the Rose Dec. were posted, similar or identical Tweets were posted on an account which Mr. Block contends was no longer operational?**[9]  The only rational answer to this question is that whoever posted those Tweets on the @DanielBlock5 account also posted them on the @DanielWayneBlo1 account.  And we know that person could not have been Mr. Block because he does not claim to have posted anything on the @DanielBlock5 account.

**Second**, the FNC Defendants conveniently ignore Paragraph 64 of the Complaint which states: "The Tweets discussed above are just a fraction of the enormous number of Tweets from

---

[9]     *Compare, e.g.*, Exhibit 10 to the Rose Dec. at 2 with Exhibit FF to the Burstein Dec.; Exhibit 10 to the Rose Dec. at 8 with Exhibit GG to Burstein Dec.; Exhibit 10 to the Rose Dec. at 14, 25-27, and 29 with Exhibit HH to the Burstein Dec.; Exhibit 11 to the Rose Dec. at 2, 12-13 and 19 with Exhibit II to Burstein Dec.; Exhibit 12 to the Rose Dec. at 12-13 with Exhibit JJ to Burstein Dec.; Exhibit 13 to the Rose Dec. with Exhibit KK to the Burstein Dec.; Exhibit 14 to the Rose Dec. with Exhibit LL to the Burstein Dec.; and Exhibit 16 to the Rose Dec. at 1, 3, 6-8, 12, 17, 26, 31-32, 34, 36, 40, and 42-43 with Exhibit MM to the Burstein Dec.

sockpuppet accounts such as the Block Twitter Account (**and indeed also from the Block Twitter Account itself**), which have continued unabated through the date of this Complaint." (Emphasis supplied)  As detailed in Ms. Tantaros's Declaration, none of the additional Tweets annexed to the Rose Dec. undermine her allegations.  Ms. Tantaros simply did not allege **every** offending Tweet from the @DanielWayneBlo1 account.  (*See* Tantaros Dec., at ¶¶ 11-12)

**Third**, the mixing in of seemingly innocent Tweets with other Tweets designed to unnerve Ms. Tantaros would be an obvious tactic.

### 2.    Ms. Tantaros's Address

The FNC Defendants seek to rely upon a "Spokeo Name Report" for Ms. Tantaros's address (Exhibit 19 to Rose Dec.), which they claim demonstrates that securing Ms. Tantaros's address would not have been a problem for Mr. Block.  However, there is a fundamental flaw in this argument: **the fact that the "current address" for Ms. Tantaros listed in the Spokeo Name Report was not the address to which the copy of Mr. Tantaros's book – purportedly sent by Mr. Block – was delivered.** (Tantaros Dec. at ¶.9)  Moreover, Ms. Tantaros denies ever receiving anything from Mr. Block.  (*Id.*)

### ARGUMENT

### POINT I

### THE GOVERNING LAW

"Sanctions may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous…."  The standard for sanctionable conduct is objective reasonableness, and therefore the court need not make a finding of bad faith….  **The Supreme Court has instructed courts to read Rule 11 to "give effect to the Rule's central goal of deference" but cautiously "in light of concerns that it will ... chill vigorous advocacy….."  " Courts therefore "resolve all doubts in favor of the party against whom sanctions are sought."** a claim has absolutely no chance of success.

15

*Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc.,* 2014 WL 4899745, at *3 (S.D.N.Y.

Sept. 30, 2014) (Swain, D.J.).  (Emphasis supplied) (Citations omitted)

Thus, sanctions are appropriate only where a claim is "destined to fail" (*Eastway Const.*

*Corp. v. City of N.Y.*, 762 F.2d 243, 254 (2d Cir. 1985)), and "lack of success on a claim is not a

basis for imposing sanctions." (*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2003

WL 21355212, at *1 (S.D.N.Y. June 11, 2003) (McKenna, D.J)).  Further, denial of a Rule

12(b)(6) motion moots a Rule 11 motion.  *See, e.g., Am. Fun & Toy Creators, Inc. v. Gemmy*

*Indus., Inc.,* 1997 WL 482518, at *12 (S.D.N.Y. Aug. 21, 1997) (Francis, M.J.).

Indeed, where, as here, a motion for sanctions is made even before a motion to dismiss is

filed, the Court cannot grant sanctions against a plaintiff because, at the Rule 12(b)(6) stage,

credibility may not be considered.  *See Kramer v. Pollock-Krasner Foundation*, 890 F. Supp.

250, 259 (S.D.N.Y. 1995) (Baer, D.J.).  Finally, as noted above, a defendant cannot use a

sanctions motion *in lieu* of a summary judgment motion.  *Safe-Strap Company, Inc.*, 270

F.Supp.2d at 416.

## POINT II

## THE COMPLAINT'S CLAIMS FOR RELIEF ARE WELL PLED

As noted above, the denial of a Rule 12(b)(6) motion in this case would necessarily moot

the FNC Defendants' sanctions motion.

In the first instance, we note that the Complaint does not allege any claims that are

governed by Fed. R. Civ. P. Rule 9.  Hence, Fed. R. Civ. P. Rule 8(a) governs an assessment of

the adequacy of the Complaint.  Under Rule 8, in order "[t]o survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  However, in assessing whether a Complaint is "plausible," the Court may not consider whether it believes the Complaint's factual allegations are true or not, because "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, at 556.  Rather, after disregarding mere conclusions, which "are not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679, the Court must determine whether the remaining allegations "permit [it] to infer more than the mere possibility of misconduct," the truth of which must be assumed. *Id.*

Given these governing standards, the Block Dec. and the other "evidence" submitted by opposing counsel are entirely irrelevant at this stage of the proceeding.  To be sure, if the Complaint is dismissed or it later turns out that Ms. Tantaros's allegations are false, the Court can then consider whether there is contrary evidence that renders the Complaint sanctionable.  But opposing counsel's evidentiary submissions cannot be used to deprive Ms. Tantaros of her rights under Rules 8 and 12(b)(6), let alone, Rule 56.

There are three claims in the Complaint: (a) a claim under 18 U.S.C. § 2520 that Ms. Tantaros was the victim of illegal electronic surveillance of her personal telephone, (b) a claim under 18 U.S.C. § 2707 for the hacking of Ms. Tantaros's computer to gain access to her personal emails, and (c) a claim for intentional infliction of emotional distress based upon the FNC Defendants' malicious, sockpuppet social media campaign against her.  If the FNC Defendants had, as they should have, filed a motion to dismiss these claims pursuant to Fed. R. Civ. P. 12(b)(6), they would each be sustained because they are well pled.

## A.     THE ILLEGAL ELECTRONIC SURVEILLANCE CLAIM

**First,** the FNC Defendants do not argue that Ms. Tantaros's illegal electronic surveillance claim is deficient for failure to plead the elements of a claim under 18 U.S.C. § 2520. Rather, their sole argument in support of sanctions is that the Complaint's allegations are contradicted by the Block Declaration:

> Without the foundation of the Daniel Wayne Block tweets, each of these causes of action is patently frivolous. Under the Wiretap Act, the plaintiff must provide a sufficient factual basis to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The only facts alleged in the Complaint that purport to provide the inference that Tantaros' telephone calls were intercepted are the tweets from the Block account. But, as demonstrated above, Burstein knew or could easily have learned that those tweets, far from indicating illegal activity by Fox News, are the friendly outpourings of a real person who considers himself a fan of Tantaros.

(Memorandum of Law in Support of the FNC Defendants' Motion for Sanctions ("Def. MOL") at 18)  Of course, the argument that Mr. Block's Tweets were merely the "friendly outpourings of a real person who considers himself a fan of [Ms.] Tantaros," calls for a credibility determination based upon an untested Declaration which we have shown is undeniably false in key respects.

As noted above, the Block Dec. and the other "evidence" submitted by opposing counsel could not be considered on a Rule 12(b)(6) motion.  The FNC Defendants have therefore unintentionally admitted that the Complaint's First Claim for Relief would survive a Rule 12(b)(6) motion.

**Second**, even absent this admission, the Complaint more than adequately alleges an illegal electronic surveillance claim:

a.      The FNC Defendants had a motive to harass Ms. Tantaros (Complaint at ¶¶ 5-6);

b.      Respected journalists have chronicled FNC's use of its media relations department and sockpuppet social media accounts to target and victimize perceive enemies (*id.*, at ¶¶ 65-69, 71-72);

c.      In 2016, Defendant Briganti admitted to a reporter that FNC did in fact have a "Black Room" where this work was carried out.  (*Id.*, at ¶ 70)  **Briganti has not submitted a Declaration denying having made this admission.**  Hence, beyond the presumption of truth that must be afforded the allegation, Briganti has acknowledged its truth by her silence.  Plainly, if the statement were false, she would have denied it;

d.      In 2013, Defendant Pete Snyder ("Snyder") told Ms. Tantaros that he and his company, Defendant Disruptor, Inc. ("Disruptor") were employed by FNC to target enemies through "sockpuppet accounts, fake websites and internet trolling" (*id.*, at ¶¶ 74-75); and

e.      There were constant instances from the Spring of 2016 to the date of the filing of the Complaint where Ms. Tantaros would have a telephone conversation with someone, and a sockpuppet Tweet would follow the next day conveying information which could only have been gleaned from listening in to Ms. Tantaros's personal telephone calls.  (*Id.*, at ¶¶ 41-64)

The FNC Defendants ask the Court to impose sanctions because Ms. Tantaros has not produced a smoking gun.  We believe to the contrary, but even if that were not so, Rule 8 does not impose any such pleading requirement.  Rather:

> The *Twombly* plausibility standard, which applies to all civil actions…, does not prevent a plaintiff from "pleading facts alleged 'upon information and belief'" where the facts are peculiarly within the possession and control of the defendant…, or where the belief is based on information that makes the inference of culpability plausible….  The *Twombly* Court stated that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]…."

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Here, (a) the relevant facts are obviously "peculiarly within the knowledge and control" of the FNC Defendants, and (b) the inferences to be drawn from Ms. Tantaros's allegations, which must be assumed true, makes Ms. Tantaros's claims more than plausible.

**Third**, additional evidence provides further support for the Complaint's allegations:

a.      After the Complaint was filed on April 24, 2017, the Executive Editor of Newsmax, a FNC competitor, noted a "huge uptick" in negative social media about Newsmax's founder, Chris Ruddy, at the time that Shine sent the email to Snyder that is annexed as Exhibit II to the Complaint (Exhibit NN to Burstein Dec., at 1).  According to another report, Ailes "had become 'obsessed' with Ruddy and the possibility that his plans to launch Newsmax TV would present a threat to Fox's conservative news hegemony."  (Exhibit OO to Burstein Dec., at 7);

b.      The Block Dec. is so obviously the product of bribery or coercion that it is evidence of a desperate consciousness of guilt on the part of the FNC Defendants;

c.      The fact that the @DanielBlock5 account was created in April of 2012, but remained dormant until June 16, 2016, strongly suggests that it is a sockpuppet account. (Exhibits N and O to Burstein Dec.)  And if that account is a sockpuppet account, the same must be true of the @DanielWayneBlo1 account because similar or identical Tweets appear on both accounts; and

d.      If accepted as true, the Block Dec. only proves that Mr. Block did not know that his Twitter Account was being used by the FNC Defendants because he believed that the @DanielBlock5 account was dormant when it was active, and that the @DanielWayneBlo1 account was active when it was dormant.

**B.      THE COMPUTER HACKING CLAIM**

Ms. Tantaros's Second Claim for Relief alleges that Ailes and Shine, on behalf of FNC,
"violated 18 U.S.C. § 2707 by directing a person paid, directly or indirectly, by [FNC] to hack
Ms. Tantaros's personal computer and gain access, *inter alia,* to her private emails." (Complaint
at ¶ 87)

The FNC Defendants cannot challenge the factual basis for this claim because the
Complaint, at ¶ 10, alleges:

> In addition, on information and belief, the source of which is a forensic
> examination of Ms. Tantaros's home laptop, a Fox News operative engaged in
> surreptitious surveillance by breaking into her personal computer and planting
> key-logging and other surveillance software on it. Forensics will show Ms.
> Tantaros's computer's anomalies are not malware or known viruses that could
> have been found or transmitted through "general surfing" of the Internet, but
> "fingerprints" that could only have been left by third-party (highly illegal) access.

There is nothing remotely inadequate about this allegation: Ms. Tantaros (a) has
specifically alleged (not on information and belief) that a forensic examination of her personal
computer revealed the presence of "anomalies [which] are not malware or known viruses that
could have been found or transmitted through 'general surfing' of the Internet, but 'fingerprints'
that could only have been left by third-party (highly illegal) access," and (b) has used this direct
factual allegation as the source of her information and belief that FNC was responsible for
installing these "anomalies."  Given FNC's motive for spying on Ms. Tantaros, the evidence of
its use of the internet to victimize perceived enemies, and its huge financial resources, it is
entirely "plausible" for Ms. Tantaros to conclude that FNC was behind the hacking of her
computer.[10]  Moreover, the Second Circuit has acknowledged that "[e]ven after a prospective

---

[10]      Moreover, the FNC Defendants' sole argument on the inferences to be drawn here is that the Block Dec.
has somehow rendered all the Tweets from the @DanielWayneBlo1 account irrelevant.  As demonstrated above,
this assumption is erroneous.

plaintiff discovers that an account has been hacked, the investigation necessary to uncover the hacker's identity may be substantial." *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015).

Moreover, Exhibit RR to the Burstein Dec. are excerpts from the conclusions reached in a 50-page report on Ms. Tantaros's personal computer issued by CYCURA, a highly respected international forensic investigation firm with clients such as Uber, The Weinstein Company, and the University of California (*see* http://www.cycura.com/#!news):

> During our assessment of the laptop of Ms. Andrea Tantaros, Cycura observed the following technical and procedural irregularities, which, in our opinion as forensic and security experts are alarming and warrant further investigation:
>
> (1) "During forensic analysis, Malicious software was found in the downloads directory and according to the run activity history, had been executed on the system. This suggests the capability of remote access or monitoring of Ms. Tantaros communications.["]
>
> (2) "Multiple wireless network connections to differing access points were seen in the logs on Ms. Tantaros' laptop, indicating a potential attack against the machine using compromised or rogue WiFi access points.
> Other than the Fox News Debate exclusion, Ms. Tantaros' laptop was utilized at her residence in a "desktop" capacity, which eliminates public WiFi hotspots as items on this list."
>
> (3) "Fox News Channel hosted a live media event on August 6, 2015. Ms. Tantaros was instructed to provide her laptop to FNC associates for the purposes of participating in the event."
> If any agent of Fox News Channel had access to her computer for system updates, or any other reason at any time, between September 28, 2015 and April 25, 2016, then they would have known her password universally."[11]

The only legal argument which the FNC Defendants make with respect to the legal sufficiency of Ms. Tantaros's 18 U.S.C. § 2701 claim is that the statute does not apply to personal computers. **But Ms. Tantaros is not alleging that the mere hacking of her personal computer is actionable.  Rather, her claim is that her computer was hacked as a means to secure the login information necessary to hack her personal email.**  Although not explicitly

---

[11]     In the Tantaros Dec., at ¶ 21, Ms. Tantaros confirms that, in August of 2015, she did provide her laptop to FNC so that she could live Tweet about the Republican Presidential Debates.

stated in the Complaint, Ms. Tantaros's Declaration makes clear that, when she realized that her computer had been hacked, she was using a Gmail account for her personal email, which was stored by Gmail, as opposed to on her computer.  (Tantaros Dec. at ¶ 22)  Hacking a computer to gain access to login information for a Gmail account is unquestionably a violation of 18 U.S.C. § 2701 for which the subscriber is "aggrieved" within the meaning of 18 U.S.C. § 2707(a).  *See Sewell*, *passim* (Reversing dismissal of claim alleging that an ex-boyfriend violated 18 U.S.C. § 2701 by hacking her computer and gaining access to her Facebook login credentials).

## C.   THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Because the FNC's attack upon Ms. Tantaros's Third Claim for Relief is based solely upon the Block Dec., sanctions cannot be awarded for the reasons identified above.   Moreover, the law is clear that the use of social media accounts to harass someone is actionable through an intentional infliction of an emotional distress claim.  *See Dennis v. Napoli*, 148 A.D.3d 446 (1st Dep't 2017).  We also note that we have never claimed that there is a private right of action under 18 U.S.C. § 2261A, the federal cyber-stalking statute. Rather, the Complaint alleges only that FNC's violation of the statute as one of the reasons why punitive damages would be appropriate in this case.

## POINT III

### SANCTIONS ARE NOT WARRANTED BASED UPON MS. TANTAROS FILING HER COMPLAINT AS OPPOSED TO PURSUING HER CLAIMS IN AN ARBITRATION

As explained in Ms. Tantaros's accompanying Memorandum of Law in opposition to the FNC Defendants' motion to compel arbitration, Ms. Tantaros is not obligated to arbitrate the claims she has advanced in this suit.  But even were the Court to grant FNC's motion to compel arbitration, sanctions would not be warranted under Rule 11(b)(2) because, as shown by her

opposition to the motion to compel, her decision to pursue an action in this Court was "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law...." Fed. R. Civ. P. 11(b)(2).

Additionally, in seeking to rely upon Justice Cohen's ruling which sent Ms. Tantaros's first case to arbitration, counsel for the FNC Defendants have failed to take note of crucial portions of the transcript annexed as Exhibit 2 to the Rose Dec.

**First**, there is following colloquy:

MR. BURSTEIN:  …  If you take their argument to a logical end, let's say Bill Shine and one of the other defendants could have raped Ms. Tantaros in the Fox building and that would be subject to arbitration because she was in the building.

THE COURT:   Wait, that's an intentional tort and that's an assault, right? That's an assault. And there is lots of case law cited in both your briefs that takes assault out of the context of the typical arbitration clause.

(*Id.*, at 25)  Here, all of Ms. Tantaros's claims are for intentional torts (whether statutory or common law) and fall far closer to an assault than they do to an employment dispute.  As such, there is nothing in the argument before Justice Cohen which suggests that his ruling was intended to bar a lawsuit for the claims asserted in this case.

**Second**, during the argument before Justice Cohen, counsel for Ms. Tantaros sought permission to amend the Complaint to add, *inter alia*, an electronic surveillance claim.  (*Id.*, at 27-29)  This request was denied **without** prejudice.  (*Id.*, at 38)  Had Justice Cohen believed that an electronic surveillance claim was unequivocally subject to arbitration, he would have denied counsel's application for leave to amend with prejudice.  Not having done so surely provided counsel a reasonable basis to believe that he could seek to litigate this claim in a courtroom.

## POINT IV

## SANCTIONS MAY NOT BE AWARDED UNDER RULE 11(b)(1)

Rule 11(b)(1) authorizes sanctions for a filing that is "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." As explained in the accompanying Burstein Dec., there is no factual merit to the claim of improper purpose.  However, the question of "purpose," proper or improper, is irrelevant here because when sanctions are sought based upon an allegedly frivolous complaint, Rule 11(b)(1) sanctions are unavailable unless that complaint is dismissed with prejudice.  As the Court stated in *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995): "[A] determination of improper purpose must be supported by a determination of frivolousness when a complaint is at issue…' A party should not be penalized for or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper." (Citation omitted)

*Sussman*, which opposing counsel should have read before filing their motion, makes clear that the FNC Defendants' complaints about threats of publicity to leverage a settlement are frivolous:

> It is not the role of Rule 11 to safeguard a defendant from public criticism that may result from the assertion of nonfrivolous claims. … Mere warnings by a party of its intention to assert nonfrivolous claims, with predictions of those claims' likely public reception, are not improper. *Id.*

## CONCLUSION

For the foregoing reasons, together with those urged in all accompanying submissions and prior proceedings, the FNC Defendants' motion for sanctions should be denied in full.

Dated: New York, New York
June 29, 2017

JUDD BURSTEIN, P.C.

By_____
Judd Burstein (JB-9585)

25