UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANDREA TANTAROS,

$\qquad$ *Plaintiff,*

$\qquad$ -- against --$\qquad\qquad\qquad\qquad\qquad$ Case No. 17-cv-02958 (GBD)

FOX NEWS NETWORK, LLC, ROGER AILES,
WILLIAM SHINE, IRENA BRIGANTI, PETER
A. SNYDER, DISRUPTOR, INC., and JOHN
DOES 1-50.

$\qquad\qquad\qquad$ *Defendants.*
----------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS FILED BY DEFENDANTS PETER A. SNYDER AND DISRUPTOR, INC.

JUDD BURSTEIN, P.C.
5 Columbus Circle, Suite 1501
New York, New York 10019
(212)974-2400
(212) 974-2944 (Fax)
*Attorneys for Plaintiff*
*Andrea Tantaros*

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELEVANT FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     Facts Relating To All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.     Facts Relating To The Snyder Defendants In Particular . . . . . . . . . . . . . . . . . . . 4

RELEVANT PROCEDURAL HISTORY

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT I

THE COMPLAINT SHOULD NOT BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . 8

     A.     The Complaint Is Not Subject To Dismissal On Statute
              Of Limitations Grounds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.     The Complaint States A Claim Under 18 U.S.C. § 2511 . . . . . . . . . . . . . . . . . 11

     C.     The Complaint States a Claim For Intentional
              Infliction of Emotional Distress . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT II

PLAINTIFF'S CLAIMS ARE NOT SUBJECT TO ARBITRATION . . . . . . . . . . . . . . . . . 20

     A.     The Snyder Defendants Waived Whatever Rights
              They Had To Arbitrate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     B.     Even Absent A Waiver, Plaintiff's Claims Are
              Not Subject To Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     C.     Specific Arguments Raised By The Snyder Defendants . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

TABLE OF AUTHORITIES

CASES

*Allen v. McCurry,*
    449 U.S. 90 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Allied Sanitation, Inc. v. Waste Mgmt. Holdings, Inc.,*
    97 F. Supp. 2d 320 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Burns v. Imagine Films Entm't, Inc.,*
    165 F.R.D. 381 (W.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Corp. Trade, Inc. v. Golf Channel,*
    No. 12 CIV. 8811 PKC, 2013 WL 5375623 (S.D.N.Y. Sept. 24, 2013) (Castel, J.),
    aff'd, 563 F. App'x 841 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Dennis v. Napoli,*
    148 A.D.3d 446 (1st Dep't 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Doe v. GTE Corp.,*
    347 F.3d 655 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Doe v. Princess Cruise Lines, Ltd.,*
    657 F.3d 1204 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dunahoo v. Hewlett-Packard Co.,*
    No. 11 CV 05588 BSJ HBP, 2012 WL 178332 (S.D.N.Y. Jan. 20, 2012) . . . . . . . . . . . 13

*Ericson v. Syracuse Univ.,*
    35 F. Supp. 2d 326 S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Fernicola v. Specific Real Prop. in Possession, Custody, Control of Healthcare*
*Underwriters Mut. Ins. Co.,*
    No. 00 CIV 5173 (MBM), 2001 WL 1658257 (S.D.N.Y. Dec. 26, 2001) . . . . . . . . . . . 15

*Gerrard v. Blackman,*
    401 F. Supp. 1189 (N.D. Ill. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gill v. Willer*,
    482 F. Supp. 776 (W.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hill v. Teel*,
    No. CIV-08-1336-M, 2009 WL 1974428 (W.D. Okla. July 6, 2009) . . . . . . . . . . . . . 17

*In re Intuit Privacy Litig.*,
    138 F. Supp. 2d 1272 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Jones v. Halliburton Co.*,
    583 F.3d 228 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jones v. Ocwen Fed. Bank*,
    147 F. Supp. 2d 219 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kaupp v. Church*,
    No. 10 CIV. 7559 JFK, 2011 WL 4357492 (S.D.N.Y. Sept. 19, 2011) . . . . . . . . . . . . 19

*Keystone Shipping Co. v. New England Power Co.*,
    109 F.3d 46 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    626 F.3d 156 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Luis v. Zang*,
    833 F.3d 619 (6th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Luken v. Edwards*,
    No. C10-4097-M WB, 2011 WL 1655902 (N.D. Iowa May 3, 2011) . . . . . . . . . . . . . 11

*Manliguez v. Joseph*,
    226 F. Supp. 2d 377 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Molefe v. Verizon New York, Inc.*,
    No. 14-CV-1835-LTS-GWG, 2015 WL 1312262 (S.D.N.Y. Mar. 24, 2015) . . . . . . . . 13

*Moran v. GTL Const., LLC*,
    No. 06 CIV 168 SCR, 2007 WL 2142343 (S.D.N.Y. July 24, 2007) . . . . . . . . . . . . . 8-9

*Phillips v. Bell*,
    365 F. App'x 133 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pritchard v. Pritchard*,
    732 F.2d 372 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ross v. Am. Exp. Co.*,
    547 F.3d 137 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*S & R Co. of Kingston v. Latona Trucking, Inc.*,
    159 F.3d 80 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Saucier v. Aviva Life & Annuity Co.*,
    589 F. App'x 701 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Schwartz v. Pub. Adm'r of Bronx Cty.*,
    24 N.Y.2d 65 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Stuto v. Fleishman*,
    164 F.3d 820 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*Thyssen, Inc. v. Calypso Shipping Corp., S.A.*,
    310 F.3d 102 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*TLS Mgmt. v. Rodriguez-Toledo*,
    No. CV 15-2121 (BJM), 2016 WL 7413482 (D.P.R. Dec. 22, 2016) . . . . . . . . . . . . . . 17

*Vazquez-Santos v. El Mundo Broad. Corp.*,
    219 F. Supp. 2d 221 (D.P.R. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vertkin v. Vertkin*,
    No. 07-4471 SC, 2007 WL 4287512 (N.D. Cal. Dec. 6, 2007) . . . . . . . . . . . . . . . . . . 17

*Walther v. Maricopa Int'l Inv., Corp.*,
    No. 97 CIV. 4816 (HB), 1998 WL 689943 S.D.N.Y. Sept. 30, 1998) . . . . . . . . . . . . . 18

*Watkins v. L.M. Berry & Co.*,
    704 F.2d 577 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wilder v. Thomas*,
    854 F.2d 605 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Winters v. Lavine*,
    574 F.2d 46 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Young v. City of S. Bend*,
    No. 3:12-CV-475-JVB-CAN, 2013 WL 5913812 (N.D. Ind. Oct. 31, 2013) . . . . . . . . 16

## STATUTES AND OTHER AUTHORITY

18 U.S.C. § 2261A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10, 15-16

18 U.S.C. § 2520(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 1738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**INTRODUCTION**

Plaintiff Andrea Tantaros ("Plaintiff" or "Tantaros") respectfully submits this Memorandum of Law ("MOL") in opposition to the motion to dismiss, or alternatively to compel arbitration, filed by Defendants Peter A. Snyder ("Snyder") and Disruptor, Inc. ("Disruptor") (collectively the "Snyder Defendants"); together with such other and further relief as the Court deems just and proper.

**PRELIMINARY STATEMENT**

In support of this motion, the Snyder Defendants rely heavily upon a declaration submitted by "The Fox News Defendants"[1] in support of their Rule 11 motion for sanctions, specifically, the Declaration of Daniel Wayne Block ("Block"), the individual from whose Twitter account various incriminating Tweets originated. Even if it were appropriate to rely upon the Block Declaration at this juncture, and it is not, Plaintiff's opposition to the Fox News Defendants' Rule 11 motion (Dkt. Nos. 52-54) demolished the credibility of Block's assertions, and provided compelling evidence that he was either coerced or bribed into providing his Declaration. (Plaintiff does not contend that Defendants' counsel were knowing participants in any such misconduct). Tellingly, the Fox News Defendants failed to submit a reply declaration from Block even attempting to address the gaping holes in his account, let alone denying that he had been a victim of coercion or the recipient of a bribe. That omission speaks volumes.

The Snyder Defendants also contend that the Complaint's allegations fail to link them to its claims. But the Complaint's allegations place them at the center of a wiretapping campaign.

---

[1]     As used herein, the "Fox News Defendants" refers collectively to Defendants Fox News Network, LLC ("Fox News"), William Shine ("Shine") and Irena Briganti ("Briganti"). For ease of reference, we include Shine in the defined term "Fox News Defendants". However, since this litigation was filed, as has been widely reported in the media, Shine was ousted from Fox News as a result of his role in the various sexual harassment scandals currently roiling the network. The Snyder Defendants and the Fox News Defendants are collectively referred to herein as ("Defendants").

The Snyder Defendants further argue that even if Plaintiff's allegations are credited, the alleged misconduct is not sufficiently abhorrent to sustain a claim for intentional infliction of emotional distress. That argument fails to do justice to Plaintiff's allegations. Defendants in this case sought to ruin Plaintiff personally, professionally, and financially, through a series of graphic, lewd, and false public posts, while terrorizing her via cyber-stalking, and cruelly signaling to Tantaros that they are monitoring her personal communications through a series of sick social media postings. Defendants' ruthless and twisted media campaign satisfies the requisite pleading standard.[2]

The Snyder Defendants' statute of limitations argument is baseless. Plaintiff gives detailed allegations that their actionable conduct continued through the filing of the Complaint.

Insofar as the Snyder Defendants seek to compel arbitration, they waived that right by moving for Rule 11 sanctions. Regardless, this case is not subject to mandatory arbitration. Defendants' alleged violations of federal criminal statutes are not within the contemplation of Tantaros's arbitration agreement with Fox News.

## RELEVANT FACTUAL BACKGROUND

**A.      Facts Relating To All Defendants**

Under Roger Ailes's ("Ailes") reign, female employees of Fox News were subjected to pervasive sexual harassment. Ailes's repulsive conduct was made possible by Shine and Briganti, as well as a host of independent contractors, such as the Snyder Defendants. This scorched earth policy was used against anybody who was considered a threat, not merely employees of Fox News.

---

[2]      The Snyder Defendants also set up a straw man argument about the criminal cyber-stalking statute 18 U.S.C. § 2261A, which does not provide for a private right of action. Plaintiff only cited 18 U.S.C. § 2261A as a basis for punitive damages, and never asserted a claim under it.

However, Fox News deemed Tantaros to be an existential threat.  In this regard, not only did Tantaros resist Ailes's crude sexual advances and the retaliation she was subjected to for rejecting him, but she refused the $1 million in hush money offered by Fox News, and instead challenged Ailes's enablers and by extension the entire power center of Fox News.  Thus, after Ailes was forced out of Fox News in July 2016 with a $40 million golden parachute, Tantaros was the only person claiming that his departure was of little consequence, because no real change at Fox News would be possible until Shine, Briganti, Denise Collins, and Suzanne Scott were held accountable.  (*See* Complaint ("Compl."), Dkt. No. 5, ¶ 6).

Defendants' response was commensurate with the threat that they saw in Tantaros. Defendants subjected Tantaros to illegal electronic surveillance and computer hacking to intimidate, terrorize, and crush her career through a stream of lewd, offensive, and professionally-damaging social media posts, blog entries and commentary, and high profile "fake" media sites which Fox News and its social-influence contractors owned or controlled.  (Compl. ¶ 7).  As part of this illegal scheme, Defendants caused a virus to be downloaded onto Tantaros's computer that allowed them to monitor her personal and professional emails and social media posts.

Defendants used the fruits of their illegal surveillance to terrorize Tantaros psychologically. In this respect, Defendants would let Tantaros know that they were monitoring her communications by conveying the substance of those communications – which could only have been gleaned through illegal surveillance – back to her through cruel social media posts.  (Compl. ¶ 8).  To give just one example, on June 19, 2016, the day after Tantaros and her mother had spoken on the telephone about plans for the third anniversary of the August 20, 2013 death of Tantaros's brother, Daniel, one of Defendants' sockpuppet accounts tweeted: "PURPLE MEMORIAL ... FOR DANIEL TANTAROS,

R.I.P. DANIEL...." (Compl. ¶ 8(b)).  In other words, this chilling Tweet was posted a full two months before the actual anniversary of Daniel Tantaros's death – but the very day after Tantaros and her mother had discussed their plans for it.

The Fox News Defendants sought to explain away this Tweet by submitting the Block Declaration.  However, the facially absurd explanation given by Block – that he learned of Daniel Tantaros's death while innocently performing Internet research, and decided that rather than a condolence card, he would send a Tweet some two months before the actual anniversary of the death – is completely upended by the fact that the Tweet was not even directed to Tantaros's Twitter handle.  Therefore, Block would have had no reason to suspect Tantaros would ever see it – unless, of course, Defendants knew that she was already monitoring the Block Twitter Account as a result of the harassing Tweets that had previously been sent from it.  Generally, Block's Declaration is so riddled with falsehoods that even without discovery, it raises the strong possibility that it was procured through some form of coercion or bribery.

The criminal scheme alleged herein has continued unabated through the date of the Complaint, which was filed long after Tantaros's tenure with Fox News ended.  (Compl. ¶ 7). Indeed, the campaign against Tantaros increased in intensity **after** Fox News fired her.  (*Id.*, ¶ 10). Even during the time Tantaros was with Fox News, the illegal conduct alleged herein was not directed towards her in the workplace, but over social media that she could access anywhere.

**B.    Facts Relating To The Snyder Defendants In Particular**

There are strong ties between the attacks administered against Tantaros and the types of attacks that Snyder admitted that he performed on behalf of Ailes in the past. (Compl. ¶ 44). Indeed, the Complaint contains detailed allegations about how the Snyder Defendants' attacks were part and

4

parcel of Ailes and Fox News' course of business. (*Id.*, at ¶ 72). These allegations are buttressed by Snyder's own admissions to Tantaros that "Shine would call him and give him instructions from Ailes as to whom he should target as an enemy through sockpuppet accounts, fake websites and internet trolling. Snyder told Tantaros that he used an 'army' of independent contractors to complete assignments, and that Disruptor was used to employ these contractors." (*Id.*, ¶ 74). This is the same conduct that was directed at Tantaros with one important difference – Defendants used illegally surveilled communications for heightened effect against Plaintiff.

The Complaint's allegations are further corroborated by emails between Snyder and Shine that Snyder forwarded to Tantaros. These emails show a close relationship between Snyder and Shine. (Exhibit HH to Compl.). In terms of the Snyder Defendants' modus operandi, Exhibit II to the Complaint is a March 6, 2014 email from Shine to Snyder attaching an article entitled "The Next Ailes: Newsmax's Chris Ruddy Preps TV Rival to Fox News," and asks: "Got a sec?" Following this email, there was a huge uptick in negative Tweets and blogs about Ruddy which, on information and belief, were operated by Snyder. (Compl. ¶ 78).

Exhibit JJ to the Complaint contains a March 16, 2014 email exchange between Shine and Snyder in which Snyder advocates an aggressive course of action: "It's time to wake the bear, recognize and crush the competition…. (no more sugar coating or being timid)…." Evidencing that Shine was Snyder's principal contact at Fox News, he wrote Tantaros that "Shine asked me to send him and (sic) email that he might (I'll let you know if he does it) send to RA." (*Id.*)

On information and belief, Snyder was still performing the same services for Shine and Fox News at least until the filing of the Complaint in this action. This information and belief is based, in part, upon the facts that in the days before the Complaint was filed, and news had leaked that

Tantaros was going to be suing Snyder for criminally cyber-stalking her through sockpuppet Twitter accounts, critical, incriminating Tweets began disappearing from several of these accounts.  For example, one of the most important Tweets in this case – a May 21, 2016 Tweet from the Block Twitter Account, which led Tantaros to regularly check his account out of concern for her personal safety, was present on the Block Twitter Account page on April 20, 2017.  By the next day, April 21, 2017, it had been deleted, giving rise to the inference that the Snyder Defendants were seeking to cover their tracks.  (Compl. ¶ 11).

The following are additional grounds for Plaintiff's information and belief that Snyder was performing the same services for Shine and Fox News up until the filing of the Complaint:

a.      As shown by Exhibit KK to the Complaint, on July 18, 2016, while counsel for Fox News and Tantaros were discussing a possible settlement of her claims, counsel for Tantaros sent an email to Fox News's counsel objecting that (i) *The Huffington Post* was about to write a story that Tantaros was taken off the air because of, *inter alia*, physical altercations with Nomiki Konst, and (ii) that Fox News had refused to deny the allegation.  Fox News's counsel responded that "[i]t will be taken care of," and the story never ran.

b.      As shown by Exhibit LL to the Complaint, on July 24, 2016, Oliver Darcy ("Darcy") of *Business Insider* called counsel for Tantaros asking for comment on the same story that had been peddled to *The Huffington Post*.  Based upon what transpired subsequently, as well as Darcy's reputation as a shill for Briganti, this was an effort by Fox News to unnerve Tantaros to convince her to settle her claims.  In response to Darcy's call, counsel for Tantaros wrote him categorically denying the allegations and copying Fox News's outside counsel.  (*Id.*, at pp. 2-4).  On that same

email chain, Briganti, who had undoubtedly peddled the story to Darcy in the first place, wrote back: "I will call Oliver Darcy at Business Insider to reinforce this." (*Id.*, at p. 1).

      c.      On April 10, 2017, counsel for Tantaros sent an email to Snyder informing him that this lawsuit was in the process of being prepared, and offering him the opportunity to settle. Thereafter, Snyder retained counsel who sought a delay of the lawsuit, which Tantaros rejected. (Compl. ¶ 80(d)).

      d.      At 9:56 p.m. on April 18, 2017, Tantaros's counsel informed Snyder's counsel that Tantaros was going to commence litigation against Snyder on April 19 or April 20, and asked him if he would accept service of the Complaint. (*Id.*, ¶ 80(e)).

      e.      At 11:13 p.m. EST on April 18, 2017 (Twitter defaults to PST in noting the time of a Tweet), just one hour and 17 minutes after Tantaros's counsel informed Snyder's counsel that Tantaros was going to be suing Snyder in the next day or two, Nomiki Konst sent out a defamatory Tweet in which she falsely claimed that Tantaros had physically assaulted and threatened her. (Exhibit MM to the Compl.).  Standing alone, the timing of this Tweet made no sense because if there had been such an altercation (and there was none) it would necessarily have taken place more than a year earlier because Tantaros has not even entered Fox News's offices since she was removed from the air in April 2016.

      f.      However, the purpose of the Tweet, as well as Snyder's role in it, became clear when, eight minutes later, it was re-Tweeted by Darcy of *Business Insider* (who, as noted, is well known in the industry as one of the "journalists" who Briganti uses to disseminate "information" when she wants to discredit a person), the very reporter to whom Briganti had originally sought to peddle the story and who was then advised by Briganti that it was untrue.  (Exhibit NN to the Compl.).

g.      Thereafter, Konst's defamatory Tweet was re-Tweeted 348 times as of April 21, 2017. (Exhibit MM to Compl.).  On information and belief, many of those re-Tweets were from accounts controlled by Snyder.

## RELEVANT PROCEDURAL HISTORY

This lawsuit was commenced on April 24, 2017. (Dkt. Nos. 1-3).  On May 24, 2017, the Fox News Defendants filed a motion for sanctions pursuant to Fed.R.Civ.P. 11(c), in which they relied heavily upon the Block Declaration.  (Dkt. Nos. 18-20).  In response, Plaintiff demonstrated numerous falsehoods contained in the Block Declaration, and made a compelling case that it was procured through coercion or bribery.  (Dkt. Nos. 52-54).  Nonetheless, the Fox News Defendants did not file a reply declaration from Block attempting to rebut those allegations.  Instead, they could only argue that Plaintiff was "fly-specking the Block Declaration" with mere "quibbles."  (Dkt. No. 63 at p. 5).

On June 20, 2017, the Snyder Defendants filed a motion for sanctions pursuant to Fed.R.Civ.P. 11(c). (Dkt. Nos. 38-40).  Later that same day, the Snyder Defendants filed this Motion to Dismiss or Alternatively to Compel Arbitration.  (Dkt. Nos. 41-43).  This opposition follows.

## ARGUMENT

## POINT I

## THE COMPLAINT SHOULD NOT BE DISMISSED

## A.      The Complaint Is Not Subject To Dismissal On Statute Of Limitations Grounds

"A motion to dismiss on statute of limitations grounds is properly viewed as a Federal Rules of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim." *Moran v. GTL Const., LLC*, No. 06 CIV 168 SCR, 2007 WL 2142343, at *1 (S.D.N.Y. July 24, 2007) (citations omitted).

A defendant may assert a statute-of-limitations defense "in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir.2008). * * *

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir.2007). Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them. *Iqbal*, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

*Corp. Trade, Inc. v. Golf Channel*, No. 12 CIV. 8811 PKC, 2013 WL 5375623, at *3 (S.D.N.Y. Sept. 24, 2013) (Castel, J.), *aff'd*, 563 F. App'x 841 (2d Cir. 2014).

The Snyder Defendants' statute of limitations argument plainly fails against this generous standard.[3] The defense of statute of limitations can hardly be said to appear on the face of the Complaint (*see Corp. Trade, Inc. supra*, at *3), especially considering that Plaintiff specifically alleges that "**[t]his criminal scheme has continued unabated through the date of this Complaint**...." (Compl. ¶ 7) (emphasis in original). Nor is this allegation some bare legal conclusion that would be insufficient under *Iqbal* or *Twombly, supra*. To the contrary, the Complaint contains detailed factual allegations which give rise to a fair inference that the Snyder Defendants were actively involved in the scheme up until the filing of this action. (*See* discussion,

---

[3]      "An intentional infliction of emotional distress claim is subject to a one-year statute of limitations. When the alleged offense is part of an ongoing pattern of harassment, the continuing tort doctrine 'permit[s][a] plaintiff to rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit.'" *Manliguez v. Joseph*, 226 F. Supp. 2d 377, 386 (E.D.N.Y. 2002) (*quoting Shannon v. MTA Metro–North R.R.*, 269 A.D.2d 218, 704 N.Y.S.2d 208, 209 (2000). There is a two-year statute of limitations for Plaintiff's claim under 18 U.S.C. § 2511. (*See* 18 U.S.C. § 2520(e)).

*supra*, at pp. 5-7 in "Relevant Factual Background" about how immediately after the Snyder Defendants learned that they were potential defendants in this lawsuit, (a) Tantaros was subjected to a new barrage of defamatory Konst Tweets, while (b) highly incriminating Tweets suddenly disappeared from the Block Twitter Account).

The notion that the Complaint's allegations are not directed to Disruptor is also unfounded. The Complaint explicitly alleges that Snyder admitted to Tantaros that he runs his cyber-warfare campaigns out of Disruptor. In other words, Disruptor, at Snyder's direction, is involved in **all** of the cyber-stalking activities alleged in the Complaint. As such, the Snyder Defendants' supposed point about the limited number of times the Complaint mentions Disruptor by name is meaningless.

Lastly, the contention that the Snyder Defendants have not worked for Fox News since 2012 is misleading at best. Snyder has admittedly been a Fox News on-air contributor through April 2017, and he received greater compensation than other contributors who made more appearances – indeed, Snyder received $15,000 a month to do next to nothing in terms of on-air contributions. In fact, upon information that based upon an analysis performed by Plaintiff's counsel, **Mr. Snyder was paid $11,489.36 per appearance, which is more than 16 times greater than the fee paid to the far-better-known on-air contributor, Bo Dietl.**[4] That set of circumstances gives rise to a fair inference that the Snyder Defendants were compensated for their cyber-attacks on behalf of Fox News through padded paychecks ostensibly for Snyder's limited on-air contributions. Additionally, there are numerous media reports about slush funds maintained by Ailes and Fox News for just the type of nefarious purposes alleged herein. (Exhibit 4 to Burstein Dec.) It could easily be technically

---

[4]      *See* the accompanying August 10, 2017 Declaration of Judd Burstein ("Burstein Dec.") at ¶¶ 9-10, and Exhibit 6 thereto; *see also* the accompanying August 10, 2017 Declaration of Evan Solomon.

accurate that the Snyder Defendants were not compensated directly by Fox News, but substantively dishonest in that they were paid indirectly out of a slush fund that could not be readily traced to Fox News.

**B.**      **The Complaint States A Claim Under 18 U.S.C. § 2511**

In seeking dismissal of the Complaint as against them on the merits, the Snyder Defendants unsurprisingly contend that they are innocent of the misconduct alleged herein.  *See* the Snyder Defendants' Memorandum of Law ("Snyder Defs' MOL"), Dkt. No. 42, p. 2 ("**Mr. Snyder and Disruptor have done no such thing.**") (emphasis in original).  If it were that easy to get a Complaint dismissed under Rule 12(b)(6), no federal lawsuit would ever survive, because all a defendant would need to do is deny the allegations.  More fundamentally, the Snyder Defendants argue that Plaintiff alleges no facts demonstrating that they intercepted her communications as required to state a Wiretap Act claim.  In making this argument, the Snyder Defendants misconstrue Plaintiff's burden under Rule 8 in asserting such a claim.  As held in *Luken v. Edwards*, No. C10-4097-M WB, 2011 WL 1655902 (N.D. Iowa May 3, 2011):

> .... Rule 8 requires that a plaintiff provide a "short and plain statement" of his claim. * * * Luken alleges Edwards intentionally intercepted telephone calls Luken was having with his attorney or others about Luken and Edwards's pending divorce. **Although Luken does not identify the manner or means Edwards used to intercept these telephone calls** ...:
>
>> Rule 8 does not ... require a plaintiff to plead "specific facts" explaining precisely how the defendant's conduct was unlawful. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam).  Rather, it is sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled "'give the defendant fair notice of what the claim is and the grounds upon which it rests,'" *id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct.1955) (alteration omitted), and "allow [ ] the court to draw

11

the reasonable inference" that the plaintiff is entitled to relief. *Iqbal*, 129 S.Ct. at 1949.

*Braden v. Wal–Mart Stores, Inc.*, 598 F.3d 585, 595 (8th Cir.2009). Luken satisfies these requirements by alleging Edwards's interception "involved listening" to and taking notes about multiple telephone calls between Luken and his attorney.[] Amended Compl. at ¶¶ 9–10. **It is reasonable to infer from these allegations that Edwards' intentionally intercepted Luken's telephone calls.** * * * I find Luken has presented factual allegations that plausibly state a ... claim and this portion of Edwards's Motion to Dismiss is denied.

*Id.,* at *4 (emphasis supplied).

Here, the Complaint contains numerous allegations supporting the reasonable inference that the Snyder Defendants intercepted or otherwise knowingly used illegally intercepted communications in order to terrorize Tantaros and ruin her professionally.  Thus, after Tantaros was clued in to follow the Block Twitter Account, bone chilling Tweets appeared on it revealing that her personal communications were being monitored on such subjects as (a) her brother's death (Compl. ¶ 60), (b) a friend being bitten by a scorpion (*id.*, ¶ 56), (c) that her young (and vulnerable) family members were currently on vacation in Disney Land (*id.*, ¶ 61), (d) personal messages with her mother (*id.*, ¶ 63), and even (e) the name of a friend's adopted dog (*id.*, ¶ 62).[5] Lewd, professionally damaging, and false claims about Tantaros also began spreading across the Internet.

With those allegations as a backdrop, the Complaint further alleges (a) close similarities between the attacks administered against Tantaros and the types of attacks that Snyder performed for Ailes in the past (Compl. ¶¶ 44, 72), (b) Snyder's own admissions that Shine identified enemies for him to target through sockpuppet accounts, fake websites, and internet trolling, (c) that he did

---

[5]     Importantly, the very content of these Tweets confirms that there was illegal surveillance.  This is so, because the subject matter of the Tweets could only have been acquired through surveillance of Tantaros's communications.

12

so through an 'army' of independent contractors employed by Disruptor (*id.*, ¶ 74), (d) the emails

attached to the Complaint showing (i) the close relationship between Snyder and Shine, (ii) a motive

to attack Chris Ruddy followed by a a huge uptick in negative Tweets and blogs about him (*id.*, ¶

78), (iii) Snyder advocating an aggressive course of action to Shine, (iv) Shine serving as Snyder's

key contact at Fox News (*id.*, ¶ 79), and (e) a slew of defamatory Tweets about Tantaros immediately

disappearing after Snyder learned that he was a potential defendant in the lawsuit, while (f) the most

incriminating Tweet disappearing from the Block Twitter Account as soon as Snyder learned that

he was in legal jeopardy.  (*Id.*, ¶ 11).

In light of these detailed allegations, none of the Snyder Defendants' case law is remotely on

point. (*See, e.g.*, Snyder Defs' MOL, at pp. 4, 10, and 13, citing *Molefe v. Verizon New York, Inc.*,

No. 14-CV-1835-LTS-GWG, 2015 WL 1312262, at *1 (S.D.N.Y. Mar. 24, 2015)). In *Molefe*, a *pro*

*se* Plaintiff contended that Verizon had plucked him out-of-the-blue as a target to intercept his calls.

The court unsurprisingly held that:

> Plaintiff offers only generalized, highly conclusory allegations that Verizon snoops
> on or wiretaps its customers through Verint, that he suffered a handful of scattered
> service interruptions, and that certain of his information migrated to his wife's
> device.  These allegations are insufficient to allege plausibly a claim that Verizon
> intentionally intercepted or disclosed Plaintiff's information.

*Molefe*, at *4.

The Snyder Defendants' reliance upon *Dunahoo v. Hewlett-Packard Co.*, No. 11 CV 05588

BSJ HBP, 2012 WL 178332 (S.D.N.Y. Jan. 20, 2012) (Jones, D.J.), borders on the absurd.  There,

the *pro se* plaintiff's

> complaint's sole allegation of an electronic "interception" that would fall under the
> Act relates to an August 20, 2009 incident in which the complaint states that
> **Dunahoo's dog sensed that HP was "checking Plaintiff's voicemail."** Compl. at

13

> ¶ 35. Beyond the conclusory allegation that "HP was illegally checking Plaintiff's voicemail," the complaint provides no further factual support for HP's alleged interception beyond that **the dog "had his ears perked up and was staring wildly" at the wireless router**. *Id.*  The Court finds that this claim lacks "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

(*Id.*, at * 5) (emphasis supplied).  In contrast to *Dunahoo*, Tantaros's wiretapping claims are not predicated upon a dog with ESP.  That the Snyder Defendants had to resort to a case such as *Dunahoo* to support their argument, only underscores the strength of Plaintiff's position.

The Snyder Defendants' citation to *Phillips v. Bell*, 365 F. App'x 133 (10th Cir. 2010), is notable largely because the case is so dissimilar to ours.  There, the plaintiff ("Phillips") complained that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") had secured recordings of her communications with a man ("Young"), which implicated them both in a murder-for-hire scheme targeting Phillips's husband.  The Court found that under the circumstances, Phillips's contention that Young had made the recordings to invade her privacy, *etc.*, were not remotely plausible:

> [D]isclosure of the recordings' contents for the purposes Ms. Phillips claims, while possible, would have clearly inculpated Mr. Young in the crime of murdering her ex-husband.  As a result, it is fairly implausible he would use such self-damning information for the purposes she contends, including invading her privacy, intentionally inflicting emotional distress, or defaming her character.

(*Id.*, at 141).  Tantaros's allegations have nothing to do with the facts of *Phillips*, where the ATF used a recording made by one suspect in a murder-for-hire investigation to secure a warrant.[6]

------------------------

[6]     The Snyder Defendants' reliance upon *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003), is also entirely misplaced.  (*See* Snyder Defs' MOL, p. 10, n. 13).  That case involved college athletes who were unknowingly filmed while unclothed in locker rooms.  The defendants (collectively "Franco") who distributed the videos for sale over the internet through websites were insolvent, so plaintiffs went after GTE, the provider of web hosting services, which the court described as the "deep pockets."  (*Id.*, at 657).  However, GTE had no knowledge of what Franco was publishing, and had required Franco to sign contracts "promising not to use the web site to conduct illegal activities, infringe the rights of others, or distribute obscenity (a promise Franco

(continued...)

The Snyder Defendants further argue that Plaintiff has failed to come forward with allegations demonstrating their knowledge that the contents of Tweets came from illegal surveillance. (*See* Snyder Defs' MOL, pp. 4 and 14, citing *Fernicola v. Specific Real Prop. in Possession, Custody, Control of Healthcare Underwriters Mut. Ins. Co.*, No. 00 CIV 5173 (MBM), 2001 WL 1658257, at *1 (S.D.N.Y. Dec. 26, 2001) (Mukasey, D.J.).[7] That is simply not an accurate assessment of Plaintiff's allegations, or the reasonable inferences to be drawn from them, and the Snyder Defendants' case law is correspondingly inapposite.   In this connection, the Snyder Defendants cite to *Jones v. Ocwen Fed. Bank*, 147 F. Supp. 2d 219 (S.D.N.Y. 2001) (Berman, D.J.), for the proposition that Plaintiff alleges no facts to support the notion that "the [Snyder] Defendants ... controlled the Twitter accounts used to post references to her purportedly unlawfully intercepted communications." (Snyder Defs' MOL, p. 4) (emphasis omitted). **Tellingly, the word "Twitter" does not even appear anywhere in the *Jones* decision.** (*See id. passim*).   Rather, that case concerned a borrower who sued his creditors *pro se* for harassing him in seeking to collect a debt. The plaintiff in *Jones* further "fail[ed] to allege what that conduct consisted of, who specifically engaged in the conduct, and when the conduct took place." *Jones*, 147 F. Supp. 2d at 224.

---

[6](...continued)
broke)." (*Id.,* at 657).   The court in *GTE Corp.* thus reasonably concluded that GTE could not be held in violation of the Statute for unwittingly supporting Franco's violations. (*Id.*, at 659). Here, Plaintiff alleges that the Snyder Defendants were active participants.

[7]      That Defendants had to go so far afield in citing *Fernicola* only highlights the lack of merit to their position.   There, the plaintiffs alleged that two defendants, Mark Rowan and Allison Denmark, fraudulently held themselves out to Verizon as the Fernicolas in order to facilitate their interception of plaintiffs' phone lines. For this reason, the *Fernicola* court held that "if Verizon was defrauded into believing that the Fernicolas had consented to the interception of their phone wires, then Verizon could not have known that the information was obtained in violation of the statute." (*Id.*, at at *7).   Tantaros does not allege that the Snyder Defendants were somehow duped into assisting the Fox News Defendants.

The argument that Snyder had to personally access Tantaros's devices is not well-taken. The statute itself only requires that a defendant "procures" or "uses" such information. *See* 18 U.S.C. § 2511(1)(a) and (b). Nor can the Snyder Defendants identify any case law to support their extreme position. To the contrary, the decision in *Young v. City of S. Bend*, No. 3:12-CV-475-JVB-CAN, 2013 WL 5913812 (N.D. Ind. Oct. 31, 2013), rebuts the Snyder Defendants' reading of 18 U.S.C. § 2511(a) and (b), while providing some true guidance on this motion.

In *Young*, a police chief was concerned about the loyalty of his subordinates and he directed that they be illegally surveilled by one subordinate ("DePaepe"). When the news of the wiretaps broke, DePaepe was fired and she hired an attorney ("Duerring") who gave interviews publishing certain details about the wiretapped communications. The employees brought suit against Duerring, among others, asserting a claim under 18 U.S.C. § 2511. When Duerring moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, the court denied the motion, holding:

> [T]he factual allegations contained in the Amended Complaint are sufficient to plausibly state an actionable claim against Duerring for violating 18 U.S.C. § 2511(1)(c). In his Motion to Dismiss, Duerring emphasizes that the Amended Complaint does not provide specific instances of when or where he allegedly talked about the contents of the recorded conversations. In addition, he highlights use of the vague pronoun "they," which the Amended Complaint uses when describing who spoke about the conversations. Using the plain, ordinary meaning of the word "they," however, reveals that both DePaepe and Duerring discussed the contents of the recorded conversations in media interviews.[] Likewise, it is reasonable to infer that Duerring knew the conversations were illegally recorded,.... [T]he Court concludes that Duerring is trying to set the standard too high, and that the Amended Complaint states a plausible claim for relief.

(*Id.*, at *2)

The Complaint alleges far more actionable conduct on the part of the Snyder Defendants than the arguably inadvertent disclosure of wiretapped communications by Duerring, an attorney who was

seeking to protect his client.  Indeed, the standard on a 18 U.S.C. § 2511 claim is hardly as daunting as the Snyder Defendants would have this Court believe.  There are numerous cases with facts that are analogous to ours – certainly closer than any of the Snyder Defendants' case law – where courts readily upheld wiretapping claims.[8]

## C.      The Complaint States a Claim For Intentional Infliction of Emotional Distress

Under New York law, a claim for intentional infliction of emotional distress requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (N.Y.1993) (*quoting Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (N.Y.1983)). However, even though this high standard ultimately places a heavy burden on plaintiffs, at the pleading stage such claims may not be dismissed unless it appears

---

[8]     *See Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir. 1983) (employer's monitoring of employee's communications without consent stated a claim); *In re Intuit Privacy Litig.*, 138 F. Supp. 2d 1272, 1274 (C.D. Cal. 2001) (Allegations that defendants implanted electronic files or "cookies" upon computer users' hard drives stated a claim); *Pritchard v. Pritchard*, 732 F.2d 372 (4th Cir. 1984) (Plaintiff stated claim against former spouse for intercepting his telephone conversations by attaching a wiretapping device to family phone); *Gill v. Willer*, 482 F. Supp. 776, 778 (W.D.N.Y. 1980) (same); *Vazquez-Santos v. El Mundo Broad. Corp.*, 219 F. Supp. 2d 221 (D.P.R. 2002) (Journalists who intercept a communication for criminal or tortious purposes are not exempt from liability under the Federal Wiretap Statute because the criminal or tortious conduct took place in the context of a media investigation); *TLS Mgmt. v. Rodriguez-Toledo*, No. CV 15-2121 (BJM), 2016 WL 7413482, at *1 (D.P.R. Dec. 22, 2016) (Allegations that defendants copied confidential information from a DropBox link stated a claim); *Gerrard v. Blackman*, 401 F. Supp. 1189 (N.D. Ill. 1975) (Attorney and hospital patient stated claim against physician, hospital and nurse for damages as a result of the monitoring of patient's conversations with her attorney); *Vertkin v. Vertkin*, No. 07-4471 SC, 2007 WL 4287512, at *2 (N.D. Cal. Dec. 6, 2007) (Allegations that defendant used software to track plaintiff's keystrokes on her computer and then used the information for various financial gains stated a claim); *Hill v. Teel*, No. CIV-08-1336-M, 2009 WL 1974428, at *2 (W.D. Okla. July 6, 2009) (Although it appeared likely that plaintiffs would not be ale to sustain a claim, court upheld complaint under Rule 12(b)(6) alleging that mother of children violated statute by recording communication with father); *Luis v. Zang*, 833 F.3d 619 (6th Cir. 2016) (Plaintiff, who had developed an online relationship with a married woman, stated a claim against the manufacturer of a device primarily useful for the surreptitious interception of electronic communications, when that device had been used by the husband to monitor communications.)

> beyond doubt that plaintiffs can prove no set of facts that would entitle them to such relief. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

*Ericson v. Syracuse Univ.*, 35 F. Supp. 2d 326, 330 (S.D.N.Y. 1999).

To be sure, *Ericson* was decided before *Twombly* or *Iqbal*, and the governing standard on a Rule 12(b)(6) motion is no longer whether Plaintiff "can prove no set of facts that would entitle [her] to relief." However, that does not render *Ericson* irrelevant, only that the Court should not dismiss unless Plaintiff's allegations fail to show a "plausible" claim for relief. *See, e.g., Twombly* and *Iqbal, supra*.

However, the Snyder Defendants argue that, as a matter of law, the conduct alleged herein was not sufficiently "atrocious" to meet the standard on a claim for intentional infliction of emotional distress. (*See* Snyder Defs' MOL, pp. 4, 5, and 15, citing *Walther v. Maricopa Int'l Inv., Corp.*, No. 97 CIV. 4816 (HB), 1998 WL 689943, at *1 (S.D.N.Y. Sept. 30, 1998) (Baer, J.)). Notably, while *Walther* held that the conduct alleged there was insufficient to state claim, it did confirm that "**[i]n certain circumstances, a pattern of harassment and atrocious conduct may give rise to an intentional infliction of emotional distress claim.**" *Walther*, 1998 WL 689943, at *4 (emphasis supplied). Such conduct was simply was not present in that case. (*Id.*)

Here, in contrast, Plaintiff does allege that the Snyder Defendants engaged in a pattern of harassment and atrocious conduct that was sufficiently outrageous to support a claim – certainly at the pleading stage, when discovery is likely to reveal even more abhorrent conduct. The types of cases where plaintiffs adequately pled claims for intentional infliction of emotional distress were analyzed by the Second Circuit in *Stuto v. Fleishman*, 164 F.3d 820 (2d Cir. 1999):

18

Stuto points to several cases in which courts have sustained claims for intentional infliction of emotional distress. However, these cases all involved some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy. *See, e.g., Macey v. NYSEG*, 80 A.D.2d 669, 436 N.Y.S.2d 389, 391–92 (3d Dep't 1981) (defendant electric company refused to restore plaintiff's electricity unless she legally separated from her husband); *Sullivan v. Board of Educ.*, 131 A.D.2d 836, 517 N.Y.S.2d 197, 199, 200 (2d Dep't 1987) (defamation and threat of bringing falsified charges used to coerce resignation of tenured professor); *Kaminski v. UPS*, 120 A.D.2d 409, 501 N.Y.S.2d 871, 872, 873 (1st Dep't 1986) (false accusation of theft, false imprisonment, verbal abuse, and threat of prosecution resulted in coerced confession and resignation); *Halperin v. Salvan*, 117 A.D.2d 544, 499 N.Y.S.2d 55, 57–58 (1st Dep't 1986) (malicious prosecution; false accusations of criminal conduct); *Bialik v. E.I. DuPont De Nemours & Co.*, 142 Misc.2d 926, 539 N.Y.S.2d 605, 606 (N.Y.Sup.1988) (plaintiff's complaint about unsafe working conditions resulted in improper disciplinary action against him, false accusation that he was responsible for accident that resulted in death of one woman, termination, discrimination after reinstatement, and second termination); *Flamm v. Van Nierop*, 56 Misc.2d 1059, 291 N.Y.S.2d 189, 190–91 (N.Y.Sup.1968) (recurring physical threats and harassing phone calls).

*Id., at* 828–29. In this case, Tantaros alleges (a) public humiliation, (b) false accusations of heinous conduct, (c) harassment, (d) if not overt physical threats, chilling reminders that Defendants knew the whereabouts of Tantaros's young relatives, and (e) permanent loss of employment.

In fact, it is clear that the use of social media accounts to harass someone is actionable through an intentional infliction of an emotional distress claim under New York law:

> Plaintiff alleges that defendant Paul J. Napoli authorized defendant Marie Napoli's access to plaintiff's work email account and personnel file and allowed Marie Napoli to use his personal email and Facebook accounts in her endeavor to harass and defame plaintiff. These allegations state causes of action for ... intentional infliction of emotional distress....

*Dennis v. Napoli*, 148 A.D.3d 446 (1st Dep't 2017).

The Snyder Defendants also argue weakly that Plaintiff failed to allege that they caused or intended to cause Plaintiff emotional distress. (Snyder Defs' MOL, pp. 4, 5, and 16) (citing *Kaupp*

19

*v. Church*, No. 10 CIV. 7559 JFK, 2011 WL 4357492, at *1 (S.D.N.Y. Sept. 19, 2011).  However,

the situation in *Kaupp* is inapposite, because the plaintiff there simply alleged that an employer knew

that its employee was engaged in tortious conduct directed towards the plaintiff.  Tantaros alleges

that the Snyder Defendants were active participants in the cyber-warfare perpetrated against her.

## POINT II

## PLAINTIFF'S CLAIMS ARE NOT SUBJECT TO ARBITRATION

### A.    The Snyder Defendants Waived Whatever Rights They Had To Arbitrate

In opposing the Fox News Defendants' motion to compel arbitration, Plaintiff demonstrated

how their having filed a motion for sanctions under Rule 11 waived the right to arbitrate.  (Dkt. No.

56 at pp. 6-16).  Those same waiver arguments apply with equal force to the Snyder Defendants, who

also filed a (baseless) Rule 11 motion seeking sanctions against Plaintiff and her attorney.  (Dkt.

Nos. 38-40).  Rather than repeat those arguments at length here, we respectfully incorporate them

herein by reference, and provide the following summary:

- The right to arbitration, like any other contract right, can be waived, which is a legal

  question for the Court.  *See Burns v. Imagine Films Entm't, Inc.*, 165 F.R.D. 381, 387

  (W.D.N.Y. 1996).

- There is no "bright line" rule for determining waiver.  *Louisiana Stadium &*

  *Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159

  (2d Cir. 2010).  However, the *sina qua non* of waiver is prejudice.  *Allied Sanitation,*

  *Inc. v. Waste Mgmt. Holdings, Inc.*, 97 F. Supp. 2d 320, 328 n.7 (E.D.N.Y. 2000);

  *accord Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir.

  2002).  While there is no "bright line" test for prejudice either, it results from a party

20

making "**motions going to the merits of an adversary's claims....**" *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83–84 (2d Cir. 1998) (citations omitted; emphasis supplied)

- The Snyder Defendants litigated substantial issues going to the merits when they moved for Rule 11 Sanctions arguing that the Complaint's allegations are demonstrably false.

- Plaintiff was further prejudiced by being forced, upon pain of sanctions, to give the Snyder Defendants a preview of her case in opposing their Rule 11 motion prior to taking discovery.

**B.    Even Absent A Waiver, Plaintiff's Claims Are Not Subject To Arbitration**

As with the waiver argument discussed immediately above, in opposing the Fox News Defendants' motion to compel arbitration, Plaintiff further showed how her claims in this case fall outside the arbitration provision contained in her employment contract. (Dkt. No. 56 at pp. 16-25). Again, rather than repeat those arguments at length here, we respectfully incorporate them herein by reference, and provide the following summary:

- Arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed to submit. *Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008).

- The arbitration clause in Plaintiff's employment contract states in pertinent part that "[a]ny controversy, claim or dispute arising out of or relating to this Agreement or [Plaintiff's] employment shall be brought before a mutually selected three-member

arbitration panel and held in New York City in accordance with the rules of the American Arbitrations Association then in effect."  (Dkt. No. 43-6, p. 11, § 8).

• This case concerns outrageous criminal and tortious behavior directed against Plaintiff that pervaded her personal and professional life for over a year, well after she had been suspended and subsequently banned from all Fox News premises, and continuing after she was ultimately terminated and up through the filing of the Complaint.  Additionally, in this case, (a) Twitter is accessible from virtually any Internet-connected device, and so Tantaros could see Defendants' social media posts when she was not at work, (b) Ms. Tantaros alleges that a Fox News operative broke into her personal, home computer, and planted key-logging and other surveillance software on it, and (c) the harassing conduct was orchestrated in part by a non-Fox News employee, Snyder.[9]

• Based upon these allegations, neither Plaintiff nor Fox News bargained to include the illegal tortious conduct at issue in this case within the scope of the clause.  *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011) (Plaintiff alleged that she was drugged and raped by fellow crewmembers on a cruise ship during an after-hours party, and that her employer, Princess Cruise Lines ("Princess"), refused to provide her with proper medical treatment and intentionally destroyed evidence of

---

[9]   It also bears mention that much of the Snyder Defendants' actionable conduct was not only directed towards Tantaros, but also to the users of Twitter and other social media that is accessible most anywhere in the world.  In other words, when setting up fake blogs or web pages attacking Tantaros, the Snyder Defendants' audience is the public at large, because they are trying influence public opinion against Tantaros.  That conduct is therefore even more divorced from Tantaros's employment.

the rape.  The court held that her claims did not fall within the scope of the arbitration clause in Doe's employment contract, which covered "all disputes, claims, or controversies whatsoever . . . relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company...."); *see also Jones v. Halliburton Co.*, 583 F.3d 228 (5th Cir. 2009) (Claims arising from plaintiff's having allegedly been gang-raped by co-workers were not covered by the relevant arbitration clauses in her employment agreement that applied to any claim she might have against her employer that was "related to [her] employment," including a "personal injury claim[] arising in the workplace").

## C.   <u>Specific Arguments Raised By The Snyder Defendants</u>

The Snyder Defendants seek to make much of the February 15, 2017 Order of Hon. David B. Cohen, read on the record.  While the Fox News Defendants did so as well, the Snyder Defendants go further, arguing that Justice Cohen's order actually has collateral estoppel effect. Because the Snyder Defendants' arguments on the issue are sufficiently different from those already briefed before the Court, we address them in this separate section.

28 U.S.C. § 1738 requires federal courts to give the same preclusive effect to state court judgments as would be given by the courts of the judgment-rendering state.  *See Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so....").  However, "a prior state court proceeding cannot bar federal court consideration of matters which were not actually litigated and determined in that prior proceeding." *Winters v. Lavine*, 574 F.2d 46, 57 (2d Cir. 1978).

23

In determining whether collateral estoppel applies to a given issue, New York courts must determine (a) if the issues sought to be litigated are identical to those decided in the previous action and are decisive in the present action, and (b) whether the party that would be bound by the previous action had a full and fair opportunity to litigate the previous determination. *Schwartz v. Pub. Adm'r of Bronx Cty.*, 24 N.Y.2d 65, 71 (1969). While it is indisputable that the Snyder Defendants were not parties to the proceeding before Justice Cohen, dispositive here is the fact that there is no identity of issues. The requirement of issue identity, "unlike the requirement of identity of parties, is an absolute requirement." *Wilder v. Thomas*, 854 F.2d 605, 617 (2d Cir. 1988) (citing New York law).

In the state court action, Tantaros brought causes of action under, *inter alia*, the New York City Human Rights Law and the New York State Human Rights Law for sexual harassment and retaliation. While we respectfully disagree with Justice Cohen's finding that those causes of action were arbitrable, Tantaros's claims in the present action are completely different from, and bear no relation to, the prior state court action, which largely concerned allegations of unwanted sexual advances and the fallout resulting from Tantaros's refusal to be sexually harassed. Moreover, while the present Complaint does contain facts that also appear in Tantaros's earlier Complaint, they were included only to provide context. *See* Compl. at ¶ 33 ("To be clear, Plaintiff is not seeking relief based upon these facts. Rather, they are set forth here only for context."). In this regard, the Complaint states in no uncertain terms that it **"does not seek damages for sexual harassment or … retaliation …"** (Compl. at ¶ 10) (emphasis supplied). Rather, the Complaint characterizes the egregious conduct to which Tantaros was subjected as, *inter alia*, "hacking," (*id.* at ¶ 1) "professional digital character-assassination," (*id.*) "criminal activity," (*id.* at ¶ 2) and "illegal

electronic surveillance." (*Id.* at ¶ 7). Plainly, these issues share no commonality with the case decided by Justice Cohen.

In support of their argument, the Snyder Defendants cite to *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 48 (1st Cir. 1997) and *Saucier v. Aviva Life & Annuity Co.*, 589 F. App'x 701, 703-07 (5th Cir. 2014). However, (a) in *Keystone Shipping*, unlike here, the parties were identical, (b) in both cases, the issues were found to be identical by either the reviewing court or the prior state court, and (c) in both cases, the governing standard for collateral estoppel was different than that of New York. *Saucier* is also factually distinguishable in that it involved the sale of an annuity settlement, which contract was deemed to be unenforceable on procedural grounds because a party thereto had not complied with applicable state law. Because the contract itself was found to be unenforceable by the state court, the court held that the litigating party was collaterally estopped from litigating the applicability of the arbitration clause in federal court. Thus, the Snyder Defendants' authority is neither binding nor persuasive.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, and based upon all proceedings heretofore had herein, Plaintiff respectfully requests that the Court issue an Order (a) denying the Snyder Defendants' motion in full and with prejudice; together with (b) such other and further relief as this Court deems just and proper.

Dated: New York, New York
      August 10, 2017

                        Respectfully submitted,
                        JUDD BURSTEIN, P.C.

                        _____
          By:   Judd Burstein
                Peter B. Schalk